[Cite as *Eckstein v. Colian*, 2012-Ohio-4038.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| KATHRYN ECKSTEIN | ) | CASE NO. 11 CO 22 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| ANTHONY T. COLIAN | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:       Civil Appeal from the Court of Common
                                Pleas of Columbiana County, Ohio
                                Case No. 11 DR 168

JUDGMENT:                       Affirmed.

APPEARANCES:

For Plaintiff-Appellee:         Atty. Jeffrey Lilly
                                Community Legal Aid Services
                                First National Tower
                                11 Central Square, Suite 700
                                Youngstown, Ohio  44503

For Defendant-Appellant:        Atty. Tracey Laslo
                                3258 East Main Street
                                Alliance, Ohio  44601

JUDGES:

Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

                                Dated:  August 27, 2012

WAITE, P.J.

{¶1}   Appellant Anthony T. Colian appeals the judgment of the Columbiana County Court of Common Pleas adopting a magistrate's decision to grant a domestic violence civil protection order ("DVCPO").  Appellant argues that the manifest weight of the evidence does not support the decision to grant the DVCPO.  The record reflects that Appellant had been married to the victim, Kathryn Eckstein ("Kathryn").  Appellant went to the victim's home to pick up their two minor children.  Appellant and Kathryn engaged in an argument and Appellant punched Kathryn in the head.  The evidence presented at trial supports a determination that Kathryn needed protection against Appellant and that the DVCPO was justified.  The judgment of the trial court is affirmed.

## Background

{¶2}   Appellant and the victim were divorced in 2008.  They had two children together, now ages four and five.  On March 27, 2011, Appellant went to Kathryn's house to pick up the children on their usual exchange day.  He was accompanied by his fiancée Mandy Grimes, who waited in the car.  Kathryn was on her front porch and as Appellant approached he began yelling and swearing at her.  He punched her in the head while she was kissing one of the children goodbye.  Kathryn then called her mother and the police.  She was taken by ambulance to the hospital, where she was told she had a concussion.

{¶3}   On March 29, 2011, Kathryn filed for a DVCPO.  She filed on only her own behalf.  A hearing was held on April 7, 2011.  Kathryn and her parents testified

for the issuance of the order and Appellant's fiancée, Mandy Grimes, testified for the defense. Appellant also testified on his own behalf.

{¶4} Kathryn stated that when Appellant arrived she was in the house with the children. She stepped out onto the porch to talk to Appellant about changing the next exchange day. She saw Grimes in the car. While they were on the porch, Appellant became angry and "flipped out all of a sudden." (Tr., p. 7.) When she was bending over to kiss one of her children, Appellant punched her in the head. She did not see the punch coming. She started crying and things became fuzzy. Grimes then got out of the vehicle and told Appellant to get in the car. (Tr., p. 8.) Kathryn called her parents, who said they would come right away. She then called the police. Kathryn's parents and the police arrived at the same time. Appellant's mother, Barbara Eckstein ("Barbara"), put an ice-pack on Kathryn's head. The police questioned her and called for an ambulance. She was taken to Salem Hospital, where they took a CAT scan. Kathryn testified that she had a concussion and that she is still being treated for headaches and neck pain from the attack. She said that she was afraid of Appellant, that he has a bad temper, and that he had attacked her in the past. (Tr., pp. 11-12.)

{¶5} Barbara and Michael Eckstein ("Michael"), Kathryn's parents, also testified. Barbara stated that Kathryn lives with them, but Barbara acknowledged that she was not at home when the attack happened. Kathryn called Barbara and was sobbing and hysterical. (Tr., p. 37.) She said that Appellant had punched her. Barbara said that she would come home immediately. The police arrived shortly after

Barbara got there. Barbara saw Kathryn sitting on the front stairs sobbing and holding her head. She put a cold compress on Kathryn's head. An ambulance arrived and took Kathryn to the hospital. Barbara testified that she had never seen Kathryn so upset or scared before, and that Kathryn is still suffering head and neck pain from the attack. She also testified that she had experienced Appellant's temper in the past and that she is afraid of him. (Tr., pp. 41-43.)

{¶6} Michael testified that his daughter Kathryn lives with him. He and his wife Barbara were only a mile and a half away when Kathryn called them. He said that Barbara received the call and that she was "[p]anic stricken" after the call. (Tr., p. 29.) He testified that he arrived at his home on March 27, 2011, to find his daughter sitting on the steps holding her head, scared and sobbing, saying "Tony punched me in my head." (Tr., p. 29.) Paramedics soon arrived. They brought a gurney in and took Kathryn away. He and Barbara went to the hospital while Kathryn was being treated. He testified that he has known Appellant for eight or nine years. He carries pepper spray in his car because he is concerned that Appellant poses a threat to his wife and daughter's safety. (Tr., p. 33.) He related an incident that occurred shortly after Kathryn and Appellant were divorced. Kathryn had phoned Appellant to tell him that the children were sick and she would not allow them to leave to go to church with him that day. Appellant arrived at the house anyway, and started beating on the front door. Michael intended going to go out to talk to him, but Barbara said, "[d]on't go out; he's a mad man." (Tr., p. 36.) They called the police, who got Appellant to leave.

{¶7}    Grimes testified that she was present when Appellant went to pick up his children on March 27, 2011.  She and Appellant had been engaged to be married for two years.  She saw Appellant go up to the porch and knock on the door.  She saw Kathryn and the children come out.  She saw Appellant and Kathryn talking, and although she could not hear exactly what they were talking about, she stated that "[a]t one point in time I noticed things were getting heated."  (Tr., p. 50.)  She could hear the argument getting louder over a period of about 13 minutes.  (Tr., pp. 54-55.)  She eventually got out of the vehicle and told Appellant that it was time to go.  (Tr., p. 50.)  She testified that she did not see Appellant touch Kathryn at all during the argument. (Tr., p. 51.)  She also testified that even though she was watching the entire argument, she could have missed something "in a blink of an eye."  (Tr., p. 56.)

{¶8}    Appellant testified that he arrived at 6:00 p.m. to pick up the children. Kathryn asked if she could have the children on Easter Sunday, and he refused. They began to "bicker back and forth."  (Tr., p. 62.)  He stated that Kathryn swore at him and yelled at him.  He stated that he was not angry at any point and that the bickering did not become loud.  He testified that Grimes told him it was time to go, so he took the children and left for home.  Appellant lives only two doors away from Kathryn, and he soon saw the police and ambulance arrive.  He stated:  "I had no clue what was going on.  She went out on a stretcher.  You know, for all I know she rammed her head in the wall."  (Tr., p. 63.)

{¶9}    Appellant also testified that soon after the divorce there was a day when Kathryn told him the children could not go to church.  He admitted that he went

to Kathryn's house and banged on the door of the house so hard that the vibrations set off the anti-theft alarm on his truck. (Tr., p. 70.)

**{¶10}** The magistrate issued the DVCPO on April 15, 2011. The magistrate found that Appellant was less than credible, particularly when he claimed he never got angry. The magistrate noted that Appellant exhibited his anger during cross-examination. The magistrate also considered the contradictory testimony between Appellant and his own witness Mandy Grimes regarding whether a heated argument had taken place. The DVCPO was issued for a period of five years, terminating on March 29, 2016.

**{¶11}** On April 25, 2011, Appellant filed a motion to set aside the DVCPO, claiming that it was issued against the manifest weight of the evidence. The court treated this motion as an objection to the magistrate's order. The court ruled on the objection on June 27, 2011. The court determined that competent credible evidence supported the magistrate's findings. This appeal followed.

<u>ASSIGNMENT OF ERROR</u>

THE TRIAL COURT'S AFFIRMATION OF THE MAGISTRATE'S DECISION TO GRANT A FINAL DOMESTIC VIOLENCE CIVIL PROTECTION ORDER WAS AN ABUSE OF DISCRETION, AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶12}** Appellant believes the trial court's decision to issue the DVCPO was against the manifest weight of the evidence. The issuance of a DVCPO will be upheld against a challenge to the manifest weight of the evidence if the trial court's

decision was supported by sufficient, competent, credible evidence. *Rosine v. Rosine*, 7th Dist. No. 09-MA-18, 2010-Ohio-613, ¶11, citing *C.E. Morris v. Foley Construction Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). When reviewing the evidence, the appellate court must indulge every reasonable presumption in favor of the trial court's judgment and findings of fact. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79, 461 N.E.2d 1273 (1984). The rationale for this presumption is that the trial court is in the best position to view witnesses and observe their demeanor, voice inflection, and gestures, and to weigh the credibility of each witness. *Id.*

**{¶13}** R.C. 3113.31 provides for a petitioner's right to request a DVCPO on behalf of herself or anyone living in the residence with her in order to obtain protection from domestic violence. Domestic violence is defined in R.C. 3113.31(A)(1), in part, as follows:

(1) "Domestic violence" means the occurrence of one or more of the following acts against a family or household member:

(a) Attempting to cause or recklessly causing bodily injury;

(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

**{¶14}** The Ohio Supreme Court has held that "[w]hen granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of

domestic violence." *Felton v. Felton*, 79 Ohio St.3d 34, 679 N.E.2d 672 (1997), paragraph two of the syllabus. "Preponderance of the evidence" means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *State v. Stumpf*, 32 Ohio St.3d 95, 102, 512 N.E.2d 598 (1987).

**{¶15}** Five witnesses testified at the final hearing in this case. Kathryn testified about the encounter with Appellant, the heated argument that ensued, and that she had been punched in the head by him resulting in her calls to the police and her parents. There is no dispute that paramedics arrived and took her to the hospital. Kathryn's parents did not see the attack, but their testimony confirms that she was crying and very upset after the incident, that she was holding her head when they arrived, and that she told them Appellant had punched her. Two witnesses testified that Kathryn is still suffering the side effects of a concussion from the incident. Appellant's own witness, Mandy Grimes, confirmed that a heated argument had taken place, although she did not personally witness the punch to the head. Michael Eckstein testified that there was a prior incident where Appellant was beating on the front door and acted like a "mad man." Michael Eckstein also testified that he carries pepper spray with him because he is afraid of what Appellant might do. Appellant denied that he became angry at Kathryn or that a heated argument had taken place, but the court did not find him to be credible and discounted his testimony. The court particularly noted that Appellant displayed his violent temper during his testimony.

There is abundant evidence in the record to support the issuance of a DVCPO in this case.

**{¶16}** Appellant takes issue with the fact that only Kathryn specifically testified about being punched and that none of the other witnesses saw it happen. This observation disregards the extensive circumstantial evidence that supports Kathryn's testimony, and circumstantial evidence has the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Furthermore, "[t]he mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself." *Cross v. Ledford*, 161 Ohio St. 469, 477-478, 120 N.E.2d 118 (1954).

**{¶17}** Because there is competent credible evidence to support the trial court's judgment granting a DVCPO, the judgment is affirmed.

Vukovich, J., concurs.

DeGenaro, J., concurs.