[Cite as *Halcomb v. Greenwood*, 2019-Ohio-194.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| RONALD J. HALCOMB, | : | |
| Appellee/Cross-Appellant, | : | CASE NOS. CA2018-03-008 |
| | | CA2018-03-010 |
| | : | CA2018-03-012 |
| - vs - | | CA2018-03-013 |
| | : | |
| | | O P I N I O N |
| SCOTT T. GREENWOOD, | : | 1/22/2019 |
| Appellant/Cross-Appellee. | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 2017 DRH 00377

Barbara J. Howard Co., LPA, Melissa Thompson Millard, 120 East Fourth Street, Suite 930, Cincinnati, OH 45202, for appellee/cross-appellant

Phyllis G. Bossin & Associates, Phyllis G. Bossin, 105 E. 4th Street, Suite 1300, Cincinnati, OH 45202, for appellee/cross-appellant

Blake P. Somers LLC, Blake P. Somers, 114 E. Eighth Street, Cincinnati, OH 45202, for appellant/cross-appellee

**S. POWELL, P.J.**

{¶ 1} The Clermont County Court of Common Pleas, Domestic Relations Division, granted reciprocal domestic violence civil protection orders ("DVCPO") to Scott T. Greenwood and Ronald J. Halcomb requiring the two men to, among other things, remain at least 500 feet apart. Greenwood and Halcomb both appeal from the domestic relations

court's decision. For the reasons outlined below, we affirm the lower court's decision granting the reciprocal DVCPOs but reverse and remand for further proceedings the provision requiring Greenwood and Halcomb to remain at least 500 feet apart upon finding such an order is untenable given the unique facts and circumstances of this case.

**The Parties**

{¶ 2} Prior to the facts leading to this appeal, the record indicates Greenwood, who is an attorney, and Halcomb, who is a licensed social worker, had been in an on-again-off-again romantic relationship since 1997. During this time, Greenwood and Halcomb purchased a home located in Clermont County, Ohio. The home is jointly held in trust by Greenwood and Halcomb as Trustees of The Scott T. Greenwood and Ronald J. Halcomb Trust. Despite still being actively involved with each other in many other aspects of their lives, the record indicates Greenwood and Halcomb broke off their romantic relationship in 2015. Greenwood and Halcomb were never married.

**Domestic Violence Civil Protection Order**

{¶ 3} This case involves the domestic relations court's decision to grant Greenwood and Halcomb reciprocal DVCPOs. A petition for a DVCPO is governed by R.C. 3113.31. *Crawford v. Brandon*, 12th Dist. Butler Nos. CA2013-08-150 and CA2013-08-151, 2014-Ohio-3659, ¶ 6, citing *Wolfe v. Wolfe*, 5th Dist. Stark No.2013CA00196, 2014-Ohio-2159, ¶ 7. Pursuant to that statute, to obtain a DVCPO the petitioner must prove by a preponderance of the evidence that the respondent has engaged in an act of domestic violence against the petitioner or petitioner's family or household members. *McBride v. McBride*, 12th Dist. Butler No. CA2011-03-061, 2012-Ohio-2146, ¶ 12, citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. "Preponderance of the evidence" means the greater weight of the evidence, or evidence that leads the trier of fact

to find that the existence of the contested fact is more probable than its nonexistence. *Eckstein v. Colian*, 7th Dist. Columbiana No. 11 CO 22, 2012-Ohio-4038, ¶ 14.

{¶ 4} As defined by R.C. 3113.31(A)(1)(a), as relevant here, the phrase "domestic violence" means the occurrence of one or more of the following acts against a family or household member:

> (i) Attempting to cause or recklessly causing bodily injury;
>
> (ii) Placing another person by the threat of force in fear of imminent serious physical harm *or* committing a violation of section 2903.211 [menacing by stalking] or 2911.211 [aggravated trespass] of the Revised Code;

(Emphasis added.)

The phrase "domestic violence" also includes "[t]he occurrence of one or more of the acts identified in divisions (A)(1)(a)(i) to (iv) of this section against a person with whom the respondent is or was in a dating relationship." R.C. 3113.31(A)(1)(b).

{¶ 5} "'Threats of violence constitute domestic violence for the purpose of R.C. 3113.31 if the fear resulting from those threats is reasonable.'" *McGuire v. Sprinkle*, 12th Dist. Warren No. CA2006-06-069, 2007-Ohio-2705, ¶ 15, quoting *Lavery v. Lavery*, 9th Dist. Summit No. 20616, 2001 Ohio App. LEXIS 5360, *4 (Dec. 5, 2001). "The reasonableness of the fear should be determined with reference to the history between the petitioner and the defendant." *Gatt v. Gatt*, 9th Dist. Medina No. 3217-M, 2002-Ohio-1749, ¶ 7, citing *Eichenberger v. Eichenberger*, 82 Ohio App.3d 809, 816 (10th Dist.1992). "[I]n order to grant a civil protection order, past acts alone are not enough and there must be some evidence of current domestic violence, as set forth in the statute." *Sprinkle* at ¶ 22.

**Family or Household Members**

{¶ 6} There is no dispute that Greenwood and Halcomb are considered family or household members to one another as that phrase is defined by R.C. 3113.31(A)(3)(a)(i).

Pursuant to that statute, a "[f]amily or household member" includes individuals who have resided together while living as a spouse to one another. There is also no dispute that Greenwood and Halcomb had been in a "dating relationship" as that phrase is used in R.C. 3113.31(A)(1)(b).

**Facts and Procedural History**

Halcomb's Petition

{¶ 7} On March 30, 2017, Halcomb petitioned the domestic relations court for a DVCPO against Greenwood. In support, Halcomb submitted a nine-page affidavit outlining his allegations that Greenwood had been verbally, emotionally, physically, and financially abusive towards him throughout their nearly 20-year relationship. Specifically, as it relates to the home they jointly hold in trust, Halcomb averred that Greenwood assured him that "*he* owns the house I live in, that I am a tenant in *his* house, and that he will evict me unless I do exactly as he says." (Emphasis sic.) According to Halcomb, this included an incident where Greenwood came into Halcomb's bedroom "turned on the lights and demanded that I get out of 'his' bed." During this time, Halcomb claimed "[Greenwood] repeatedly demanded that I get out of his bed and that I was in his house and that he owned everything."

{¶ 8} Continuing, Halcomb averred Greenwood "threatens that if I do not follow his commands, he will see to it that I am living in a bed-bug infested apartment." Halcomb also alleged Greenwood threatened to stop paying the home's utility bills unless he complied with his demands. This, according to Halcomb, prompted him to have the utilities transferred into his name because he "did not want to continue to allow [Greenwood] to use this as a means to control me." Halcomb further averred that he was "truly fearful that [Greenwood] will hurt me if I do not have exclusive occupancy of our home[.]" Concluding,

- 4 -

Halcomb claimed Greenwood's verbal and emotional abuse had caused him crippling anxiety and depression that has resulted in him having a nervous breakdown and panic attacks.

{¶ 9} After receiving Halcomb's petition, the domestic relations court granted Halcomb a temporary ex parte DVCPO against Greenwood. It is undisputed that the temporary ex parte DVCPO Halcomb received against Greenwood required Greenwood to stay at least 500 feet away from Halcomb.

Greenwood's Petition

{¶ 10} On May 5, 2017, Greenwood petitioned the domestic relations court for a DVCPO against Halcomb. In support, Greenwood submitted a two-page letter alleging Halcomb physically attacked him and threatened to kill him on the evening of March 20, 2017. This, according to Greenwood, was "just the latest violent incident over many years." Specifically, as Greenwood alleged:

> The evening of March 20, 2017, after drinking heavily, [Halcomb] started demanding I deed the house over to him. He has been doing so for months. He insisted that I could never come back to my home, and that I would leave the house "one way or another, either alive or dead." He head-butted me violently, knocking off my glasses and causing me pain in my forehead and face. He started shaking and trembling, and continued his tirade that I just needed to die. This continued for approximately 15 minutes more until I convinced him to go to bed. That night, I was unable to sleep, because I feared that he would come into my room and attack me.

Continuing, Greenwood alleged:

> On the next night, March 21, 2017, [Halcomb] again drank heavily. He again threatened me. He got into my face in the great room and in the kitchen, slapped me, and again insisted that I deed him the house and never return home. He started to shake and tremble uncontrollably. He again told me that I would never return to the house, and that if I did, he would do something that he might regret, but that he would be absolved because of his diagnosis of mental illness. I went to my room,

- 5 -

again unable to sleep, and left as soon as possible in the morning.

{¶ 11} Greenwood also alleged Halcomb had searched through his cellphone and computer. This, according to Greenwood, resulted in Halcomb gaining access to his personal and work e-mail, text messages, and calendar. Greenwood further alleged Halcomb had "removed or destroyed work and personal files, records, and family heirlooms." Concluding, Greenwood alleged he was terrified of Halcomb and fears "his violence, his threats, and his efforts at extortion."

{¶ 12} After receiving Greenwood's petition, the domestic relations court granted Greenwood a temporary ex parte DVCPO against Halcomb. Just as Halcomb's DVCPO required Greenwood to stay at least 500 feet away from Halcomb, it is undisputed that Greenwood's temporary ex parte DVCPO against Halcomb also required Halcomb to stay at least 500 feet away from Greenwood.

**Hearing on Halcomb and Greenwood's Petitions**

{¶ 13} On September 13, 2017, a full hearing on both Halcomb's and Greenwood's petitions was held before a domestic relations court magistrate. The only two witnesses to testify at this hearing were Halcomb and Greenwood. The following is a summary of the testimony and evidence presented at this hearing.

<u>Greenwood's Testimony</u>

{¶ 14} Greenwood testified that he and Halcomb are now former life partners who had been in a long-term romantic relationship for approximately 20 years. According to Greenwood, their relationship is no longer viable due to Halcomb's threats and physical abuse. This includes an incident on the evening of March 20, 2017 wherein Greenwood alleged Halcomb assaulted him by headbutting him in the forehead. As noted above, this incident ultimately resulted in Greenwood petitioning the domestic relations court for a

DVCPO against Halcomb.  As Greenwood testified regarding this incident:

> [GREENWOOD]: * * * We went to dinner.  I think it was a chicken wing place.
>
> [GREENWOOD'S TRIAL COUNSEL]: Okay.
>
> [GREENWOOD]: And later in the evening after he had been drinking about half a box of wine, a five liter box of wine plus a few beers at the chicken wing place, [Halcomb] initiated an argument.
>
> [GREENWOOD'S TRIAL COUNSEL]: About what?
>
> [GREENWOOD]: About the house. * * * He demanded that I quitclaim deed the house over to him, that I quitclaim it, that I give him the house.  This was… and everything in it.  This is something he had been demanding pretty much every time I talked to him for months in messages.  And I told him it was not going to happen.  He told me that I would not be coming back to the house, would not be returning to the house and that I would be leaving it one way or another, alive or dead and he head-butted me.
>
> [GREENWOOD'S TRIAL COUNSEL]: Where… so this may go without saying what the word head-butt means, but where did he head-butt you?
>
> [GREENWOOD]: So with his, the top of his forehead and he butted me in my forehead and in the bridge of my nose which pushed my glasses into my face and bent the frame.

Continuing, Greenwood testified:

> [GREENWOOD'S TRIAL COUNSEL]: Okay, did that incident cause you pain?
>
> [GREENWOOD]: Absolutely.
>
> [GREENWOOD'S TRIAL COUNSEL]: Where?
>
> [GREENWOOD]: Immense headache in the forehead, in the area around the bridge of my nose and around my eyes.

Concluding, Greenwood testified:

> [GREENWOOD'S TRIAL COUNSEL]: Okay, what happened after he head-butted you?

[GREENWOOD]: Well, he threatened again to kill me. Told me I would be leaving the house one way or another, alive or dead. And he was shaking uncontrollably and then he just started screaming at me that I needed to die. I needed to just die and do the world a favor. If I just died then all of his problems would be solved and he would be able to keep the house.

After being headbutted by Halcomb, Greenwood took an over-the-counter pain reliever and went upstairs to the guest bedroom to sleep. During this time, Greenwood testified he was in "a lot of pain" and "very upset." Greenwood also testified that he "did not sleep because [he] thought [Halcomb] would be coming in the room to attack [him]." When asked if he was afraid of Halcomb after being headbutted that evening, Greenwood testified "[a]bsolutely."

{¶ 15} Greenwood testified that a similar incident occurred the following night where Halcomb again threatened to kill him and slapped him in the face. This is in addition to the many threats Greenwood testified Halcomb allegedly made towards him. For instance, confirming Greenwood's testimony, the record indicates Halcomb sent Greenwood numerous text messages claiming he would have him disbarred and sent to prison if he did not deed the house to him. Halcomb made additional threats towards Greenwood – who Halcomb sometimes referred to as Satan and Demon – claiming he would take Greenwood to court and drop a "nuclear bomb" if he refused to sign the house over to him.

{¶ 16} During cross-examination, Halcomb's trial counsel presented Greenwood with numerous audio and video recordings of exchanges between Greenwood and Halcomb. Halcomb's trial counsel also submitted hundreds of pages of text messages between Greenwood and Halcomb. As part of these exchanges, Greenwood referred to Halcomb as his "tenant," "attendant," and "slave," the latter "unequivocally, no questions asked." This includes, but is certainly not limited to, the text message exchange between Greenwood and Halcomb on the afternoon of July 22, 2016:

[HALCOMB]: You are not going to control me ever again. I don't want you back. I need to know that I'm safe, protected, and free of danger from you[.]

[GREENWOOD]: You're never in any danger with me!

[GREENWOOD]: I'm not controlling you in the least!

[GREENWOOD]: You need to calm down. Have you scheduled your MRI?

[HALCOMB]: You had me arrested, you threatened my career, you had a [restraining order]. I'm over you!

[GREENWOOD]: I did not just do those things!

[GREENWOOD]: I just saved your life!

[HALCOMB]: Yes, you did, to control me, and take everything I ever worked for away from me. If I weren't with you, my life wouldn't have been endangered.

A short time later, Greenwood and Halcomb had the following text message exchange:

[HALCOMB]: Let me go, [Greenwood]. Don't hurt me, just let me go. You will never be troubled by me again.

[GREENWOOD]: You don't trouble me.

[HALCOMB]: Let me go! And, be kind.

[HALCOMB]: Just let me go, in peace. Or, I may die.

[GREENWOOD]: You don't need to go anywhere. You're in your forever family.

[GREENWOOD]: And your forever home.

{¶ 17} The record also indicates Greenwood repeatedly demanded Halcomb turn on and leave on his cellphone's location services, a feature that allowed Greenwood to see Halcomb's exact position at all times. Many of Greenwood's demands for Halcomb to turn on his location services occurred mere minutes after Halcomb turned this feature off. This includes, but is in no way limited to, a text message from Greenwood to Halcomb at 6:54

p.m. on October 6, 2016, wherein Greenwood stated, "Answer me. Where are you, with whom, and where are you going? Answer now." Greenwood also text messaged Halcomb at 1:14 p.m. on January 10, 2017, "Turn your location ON and STOP turning it off. Or I WILL shut off the internet cable, water, gas, electric." Greenwood, however, downplayed his conduct by claiming Halcomb also asked him to turn on his own cellphone's location services "so he could keep tabs on where I was when my business partner and I were traveling for work."

{¶ 18} In addition to this testimony, the record indicates Greenwood repeatedly told Halcomb through a series of text messages that he would shut off the utilities and evict him from the home they jointly held in trust if he did not adhere to his demands and remain in the relationship. For example, Greenwood text messaged Halcomb at 10:00 p.m. on January 11, 2016: "Well, enjoy having no water, electricity, heat, or Internet. Shutting them all off tomorrow so you can run to your baby[.]" This came mere minutes after Halcomb text messaged Greenwood: "We are through. I will always care for you. I wish you well in life. Good bye."

{¶ 19} Greenwood also text messaged Halcomb regarding their home, "I absolutely do have the entire, sole right to determine who is in that house. If the pig [referring to Halcomb's friend] shows up, I'll have it arrested."[1] The record indicates Greenwood further threatened Halcomb that he would divulge his medical records, subpoena his friend, and "destroy" him by subjecting him to weeks of depositions. Specifically, as Greenwood text messaged Halcomb at 10:41 p.m. on March 27, 2017:

> [GREENWOOD]: Just wait until I subpoena every single message, call, email, etc. he sent. And every single piece of

---

1. In addition to calling Halcomb's friend a pig, the record indicates Greenwood referred to Halcomb's mother, grandmother, and other family members in various disgusting, repugnant, and insulting terms that this court declines to repeat in this opinion.

paper in his possession that pertains to me, my home, and businesses. I will have him in depositions for *weeks* about all of what he's done.

\* \*

Does [your friend] have 3 or 4 weeks of paid vacation to use for his deposition? No, because he's used everything for his multiple morbid obesity surgeries? Aww – he'll have to take leave without pay as I walk him through every single communication for the last 20 years!

{¶ 20} When asked if any of these statements were threats to Halcomb or his friend, Greenwood testified he had never made any threats towards Halcomb or his friend. Specifically, as Greenwood testified, "I'm not threatening to do anything," "I didn't threaten anything," and "I didn't threaten him." Greenwood made these claims despite the text messages referenced above, as well as the multiple audio and video recordings demonstrating Greenwood's abusive and abhorrent behavior towards Halcomb. This includes several incidents where Greenwood can be heard yelling at Halcomb calling him "white trash" who was "always white trash." Greenwood can also be heard screaming at Halcomb calling him a "bitch," a "motherfucker," and ordering Halcomb not to treat "your owner like that," a statement Greenwood followed up by stating "I really am your owner, you don't have anything else going on."

<u>Halcomb's Testimony</u>

{¶ 21} Halcomb testified that Greenwood had been physically, emotionally, spiritually, and financially abusive towards him for nearly their entire 20-year relationship. This included many instances where Halcomb alleged Greenwood belittled him and his family, as well as erased his hard drive on his computer. Halcomb also testified that Greenwood had forged his name on a credit card and proceeded to accumulate charges totaling nearly $100,000.

{¶ 22} Halcomb further testified regarding the numerous threats levied against him by Greenwood. As Halcomb testified, this included threats from Greenwood that he would "destroy" him and evict him from their home if Halcomb did not adhere to his demands. As noted above, the record indicates most of these threats were the result of Halcomb telling Greenwood he wanted to end their relationship and move on with their respective lives. When asked to explain his fear of Greenwood, Halcomb testified:

> [HALCOMB]: He, he scares me when he is having his tantrums, when he screams. He throws things. He threatens to destroy my property. He threatens me with arrest. And it's reached a point where I just can't take it anymore, any longer.

The audio and video recordings, as well as the hundreds of pages of text messages, confirm Halcomb's testimony.[2]

{¶ 23} Continuing, as it relates to Greenwood's testimony that Halcomb had headbutted and slapped him on the evenings of March 20 and 21, 2017, Halcomb testified he was never physically abusive towards Greenwood. Therefore, although he did not explicitly deny headbutting or slapping Greenwood as Greenwood alleged, it is nevertheless clear Halcomb denied that he had ever engaged in such conduct both during and after their relationship ended. Concluding, when asked why he petitioned the domestic relations court for a DVCPO against Greenwood, Halcomb testified "[m]y safety." As Halcomb testified:

> [HALCOMB'S TRIAL COUNSEL]: Your safety, okay. And are you doing this for some financial motivation?
>
> [HALCOMB]: Not at all.
>
> [HALCOMB'S TRIAL COUNSEL]: Why are you asking for this?

---

2. The domestic relations court admitted all 66 audio recordings and five video recordings offered by Halcomb. This court has reviewed each of these recordings in their entirety, as well as the hundreds of pages of text messages offered by both Halcomb and Greenwood. It should be noted that many of the audio recordings are less than one-minute long. It should also be noted that two of the recordings are identical; a 13-second audio recording of Greenwood yelling at Halcomb to get the dog out of the bed.

[HALCOMB]: I am afraid of him. I want to be free.

## Magistrate's Decision

{¶ 24} After taking the matter under advisement, the magistrate issued a decision dismissing both Greenwood's and Halcomb's petitions. In reaching this decision, the magistrate found Greenwood's claims that Halcomb headbutted him did not constitute domestic violence under either R.C. 3113.31(A)(1)(a) or (b) that necessitated the issuance of a DVCPO. This is because, according to the magistrate, Greenwood did not seek any medical treatment or call the police after he was assaulted.

{¶ 25} The magistrate also found Halcomb's claims that Greenwood had been physically, emotionally, spiritually, and financially abusive towards him did not constitute domestic violence because Greenwood's conduct did not "place [Halcomb] by threat of force in fear of imminent serious physically harm." Rather, according to the magistrate, Greenwood's conduct was "simply not threatening in a way the statute prohibits, generally or even with regard to menacing by stalking." The magistrate further found that Halcomb was "not truly afraid" of Greenwood.

## Domestic Relations Court's Decision

{¶ 26} Both Greenwood and Halcomb filed objections to the magistrate's decision. After reviewing the magistrate's decision, Greenwood and Halcomb's objections, and the transcript of the hearing on Greenwood and Halcomb's petitions, the domestic relations court overruled the magistrate's decision and found the evidence was sufficient to grant Greenwood and Halcomb reciprocal DVCPOs against one another.

{¶ 27} In so holding, the domestic relations court found regarding Greenwood's petition for a DVCPO against Halcomb:

> [Greenwood] testified that on or about March 20, 2017, [Halcomb] head butted [Greenwood] in the forehead.

[Greenwood] met his burden of proof by showing that [Halcomb] attempted to cause bodily injury.

Continuing, the domestic relations court stated:

> Although the evidence supported a finding that [Halcomb] also committed an act of domestic violence of menacing by stalking, whether [Greenwood] came with "clean hands" is not relevant in determining whether [Halcomb] committed an act of domestic violence. In addition, [Greenwood's] failure to seek medical treatment or contact law enforcement does not itself negate the credibility of his testimony. After reviewing all the evidence, this Court finds that [Greenwood] showed by a preponderance of credible evidence that [Halcomb] committed an act of domestic violence when he attempted to cause bodily injury to [Greenwood] by head butting (sic) him.

{¶ 28} Similarly, the domestic relations court found regarding Halcomb's petition for a DVCPO against Greenwood:

> Although the evidence may not support a finding that [Greenwood's] actions placed [Halcomb] in fear of imminent serious physical harm or that [Halcomb] was truly afraid of [Greenwood], this does not dispose of the issue whether [Greenwood] committed an act of menacing by stalking. Upon review of the emails between the parties it is clear that [Greenwood's] actions would cause mental distress to an average person. After reviewing all the evidence, this Court finds [Halcomb] showed by a preponderance of credible evidence that [Greenwood] committed the act of domestic violence of menacing by stalking.

{¶ 29} Concluding, the domestic relations court determined that granting exclusive occupancy of the home was not appropriate in this case. The domestic relations court also found it was not appropriate to "grant either party an order preventing the other from coming to the residence." The domestic relations court instead ordered Greenwood and Halcomb to remain at least 500 feet apart from one another.

**Appeal**

{¶ 30} Both Greenwood and Halcomb now appeal from the domestic relations court's decision, collectively raising five assignments of error for review. For ease of discussion,

- 14 -

Greenwood's and Halcomb's first assignments of error challenging the domestic relations court's decision to grant the parties reciprocal DVCPOs will be addressed together.

## Manifest Weight of the Evidence

{¶ 31} Greenwood's Assignment of Error No. 1:

{¶ 32} THE TRIAL COURT ERRED WHEN IT SUSTAINED RONALD'S OBJECTIONS AND GRANTED RONALD'S PETITION FOR DOMESTIC VIOLENCE CIVIL PROTECTION ORDER WHEN SUCH AN ORDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 33} Halcomb's Assignment of Error No. 1:

{¶ 34} THE TRIAL COURT ERRED WHEN IT SUSTAINED SCOTT'S OBJECTIONS AND GRANTED SCOTT'S PETITION FOR DOMESTIC VIOLENCE CIVIL PROTECTION ORDER WHEN SUCH AN ORDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 35} In their first assignments of error, Greenwood and Halcomb argue the domestic relations court erred by granting the parties reciprocal DVCPOs. In support, both Greenwood and Halcomb argue the domestic relations court's decision was against the manifest weight of the evidence. We disagree.

## Standard of Review

{¶ 36} "A trial court's decision to deny or grant a [DV]CPO will not be reversed where such decision is supported by the manifest weight of the evidence." *Glancy v. Spradley*, 12th Dist. Butler No. CA2012-02-024, 2012-Ohio-4224, ¶ 8. The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case. *Dunn v. Clark*, 12th Dist. Warren No. CA2015-06-055, 2016-Ohio-641, ¶ 8, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. In considering a manifest weight

- 15 -

challenge, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered. *Hacker v. House*, 12th Dist. Butler No. CA2014-11-230, 2015-Ohio-4741, ¶ 21, citing *Eastley* at ¶ 20. A judgment will not be reversed as being against the manifest weight of the evidence where the judgment is supported by some competent, credible evidence going to all essential elements of the case. *Sterling Constr., Inc. v. Alkire*, 12th Dist. Madison No. CA2016-12-032, 2017-Ohio-7213, ¶ 8.

### Analysis: Greenwood's DVCPO Against Halcomb

{¶ 37} As noted above, Halcomb argues the domestic relations court erred by granting Greenwood a DVCPO. The domestic relations court granted Greenwood a DVCPO in accordance with R.C. 3113.31(A)(1)(a)(i). Pursuant to that provision of the DVCPO statute, the domestic relations court found Greenwood proved by a preponderance of the evidence that Halcomb committed an act of domestic violence by "[a]ttempting to cause or recklessly causing [him] bodily injury." "Though R.C. 3113.31 does not define the term 'bodily injury,' we note that for purposes of the offense of domestic violence under R.C. 2901.01(A)(3), 'physical harm' to a person means 'any injury, regardless of its gravity or duration.'" *J.R. v. E.H.*, 10th Dist. Franklin No. 16AP-431, 2017-Ohio-516, ¶ 13, quoting *State v. Reynolds*, 10th Dist. No. 03AP-701, 2004-Ohio-3692, ¶ 14.

{¶ 38} Halcomb initially argues the domestic relations court erred by granting Greenwood a DVCPO since Greenwood's claim that he was terrified and fearful of Halcomb was fabricated and unsupported by the record. However, as the record indicates, the domestic relations court granted Greenwood a DVCPO under R.C. 3113.31(A)(1)(a)(i). As noted above, that provision merely required Greenwood to prove by a preponderance of

the evidence that Halcomb committed an act of domestic violence by attempting to cause or recklessly causing Greenwood bodily injury. Therefore, unlike a DVCPO under R.C. 3113.31(A)(1)(a)(ii), which requires a finding that the respondent placed the petitioner "by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code," nowhere within R.C. 3113.31(A)(1)(a)(i) is there a requirement that Greenwood be terrified or fearful of Halcomb before the domestic relations court could grant Greenwood a DVCPO. Halcomb's claim otherwise lacks merit.

{¶ 39} Halcomb also argues the domestic relations court erred by granting Greenwood a DVCPO since the only evidence indicating he ever attempted to cause or recklessly caused Greenwood bodily injury was Greenwood's own testimony that Halcomb headbutted him in the forehead and slapped him in the face. While this may very well be true, the Ohio Supreme Court "has expressly rejected the contention that corroborating eyewitness testimony or medical evidence must be presented to establish domestic violence by a preponderance of the evidence." *Crawford v. Brandon*, 12th Dist. Butler Nos. CA2013-08-150 and CA2013-08-151, 2014-Ohio-3659, ¶ 17, citing *Felton*, 79 Ohio St.3d at 44-45. Therefore, based on the Ohio Supreme Court's holding in *Felton*, Greenwood's testimony, standing alone, was sufficient to meet the preponderance of the evidence standard necessary to obtain a DVCPO without any additional evidence corroborating his testimony. *See Weismuller v. Polston*, 12th Dist. Brown No. CA2011-06-014, 2012-Ohio-1476, ¶ 23 (appellant's testimony, if credible, is sufficient to meet the preponderance of the evidence standard).

{¶ 40} In so holding, when considering the domestic relations court granted Greenwood's petition for a DVCPO, the domestic relations court clearly found credible

Greenwood's testimony that Halcomb, at a minimum, headbutted him in the forehead. "[I]t is well-established that a trial court, particularly a domestic relations court, is in the best position to resolve disputes of fact, and assess the 'credibility of witnesses' and the weight to be given to their testimony." *Bates v. Bates*, 10th Dist. No. 04AP-137, 2005-Ohio-3374, ¶ 38. Because the domestic relations court is best suited to assess Greenwood's credibility and the weight to be given to his testimony, we decline Halcomb's invitation to substitute our judgment for that of the domestic relations court concerning Greenwood's credibility or the weight to be afforded to Greenwood's testimony.

{¶ 41} Halcomb next argues the domestic relations court erred by granting Greenwood a DVCPO since Greenwood's petition was nothing more than a retaliatory tactic to punish Halcomb for ending their nearly 20-year relationship. However, when reviewing the record properly before this court, Halcomb's claim is based on nothing more than pure speculation. Greenwood in fact specifically denied that was his motivation behind his request. Like above where this court declined Halcomb's invitation to substitute our judgment for that of the domestic relations court concerning Greenwood's credibility, we also decline Halcomb's invitation to speculate as to Greenwood's motive in petitioning the domestic relations court for a DVCPO in this case.

{¶ 42} Regardless of Greenwood's motivation, the fact remains that the domestic relations court found credible Greenwood's testimony Halcomb attempted to cause or recklessly caused him bodily injury by headbutting him in the forehead. Therefore, because there was sufficient credible evidence to prove by a preponderance of the evidence that Greenwood was entitled to a DVCPO against Halcomb, the domestic relations court's decision to grant Greenwood a DVCPO is affirmed. Halcomb's first assignment of error lacks merit and is overruled.

**Analysis: Halcomb's DVCPO Against Greenwood**

{¶ 43} Greenwood argues the domestic relations court erred by granting Halcomb a DVCPO. Unlike Greenwood's DVCPO that was granted in accordance with R.C. 3113.31(A)(1)(a)(i), due to the fact that he and Greenwood were in a "dating relationship," the domestic relations court granted Halcomb a DVCPO in accordance with R.C. 3113.31(A)(1)(b). Pursuant to that statute, the domestic relations court found Halcomb proved by a preponderance of evidence that Greenwood committed an act of domestic violence by engaging in menacing by stalking in violation of R.C. 2903.211. As defined by R.C. 2903.211(A)(1), "menacing by stalking" means engaging in a "pattern of conduct" that knowingly causes another "to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person[.]" The phrase "pattern of conduct" is further defined by R.C. 2903.211(D)(1) to mean "two or more actions or incidents closely related in time[.]" In determining what constitutes a pattern of conduct, the domestic relations court must take every action of the respondent into consideration even if some of the actions in isolation do not seem particularly threatening. *Middletown v. Jones*, 167 Ohio App.3d 679, 2006-Ohio-3465, ¶ 10 (12th Dist.).

{¶ 44} Pursuant to R.C. 2903.211(D)(2), "mental distress" means either: (1) any mental illness or condition that involves some temporary substantial incapacity; or (2) any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services. "It is the duty of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's actions." *Fouch v. Pennington*, 12th Dist. Clermont No. CA2011-10-075, 2012-Ohio-3536, ¶ 13, citing *Jones*, 2006-Ohio-3465 at ¶ 10.

{¶ 45} Greenwood initially argues the domestic relations court erred by granting Halcomb a DVCPO since Halcomb made no showing that he caused Halcomb to suffer any actual mental distress. Based on Halcomb's testimony, the domestic relations court found Greenwood's actions would cause mental distress to an average person, thereby necessitating the issuance of a DVCPO. We find no error in the domestic relations court's decision. As the record firmly establishes, Greenwood knowingly engaged in conduct that, caused Halcomb mental distress, if not physical harm.[3] This includes Greenwood's repeated threats and harassment of Halcomb in person, as well as through phone calls, voicemail messages, text messages, and e-mail. This is confirmed by Halcomb's own testimony, wherein Halcomb testified, in pertinent part, the following:

> [HALCOMB'S TRIAL COUNSEL]: How would you describe your relationship with [Greenwood] over the years?
>
> [HALCOMB]: Very abusive.
>
> [HALCOMB'S TRIAL COUNSEL]: Was it physical?
>
> [HALCOMB]: Yes.
>
> [HALCOMB'S TRIAL COUNSEL]: Were you ever in fear for your life?
>
> [HALCOMB]: Yes.
>
> [HALCOMB'S TRIAL COUNSEL]: Can you tell the Court an occasion where you were physically threatened?
>
> [HALCOMB]: Yes. There was a time in the kitchen when he was having a tantrum and he put his hand over my nose and mouth so that I couldn't breathe. And I literally thought I was going to die.

Halcomb also testified that Greenwood had been physically, emotionally, spiritually, and

---

3. Although not explicit, several of the audio and video recordings admitted into evidence allude to acts of physical violence by Greenwood against Halcomb.

financially abusive towards him. The audio and video recordings, as well as the hundreds of pages of text messages, confirm Halcomb's testimony.

{¶ 46} Despite Greenwood's arguments to the contrary, the record clearly indicates that this was not merely an "uncomfortable situation" based on "emotional bickering" regarding "past acts" between him and Halcomb. To claim otherwise improperly minimizes Greenwood's overtly nefarious and abhorrent conduct directed towards Halcomb. The same is true regarding Greenwood's claims that this was nothing more than an "airing of grievances" by a "bickering couple at the contentious end to a twenty-year relationship[.]" Greenwood's conduct in repeatedly threatening and harassing Halcomb in person, as well as through phone calls, voicemail messages, text messages, and e-mail rises well beyond what should be considered merely innocuous disagreements between the two, regardless of the contentious nature of their relationship.

{¶ 47} In so holding, we note that Greenwood claims Halcomb's lies, inconsistent testimony, and the way he presented "incomplete evidence" to the domestic relations court call into question his credibility and the domestic relations court's decision to grant the DVCPO at issue. However, as noted above, while there may be questions regarding Halcomb's credibility, just as there may be questions regarding Greenwood's credibility, "it is well-established that a trial court, particularly a domestic relations court, is in the best position to resolve disputes of fact, and assess the 'credibility of witnesses' and the weight to be given to their testimony." *Bates*, 2005-Ohio-3374 at ¶ 38. Just as we did when asked to substitute our judgment of Greenwood's credibility for that of the domestic relations court, we decline Greenwood's invitation to substitute our judgment for that of the domestic relations court concerning Halcomb's credibility and the weight to be afforded his testimony. Therefore, because there was sufficient credible evidence to prove by a preponderance of

the evidence that Halcomb was entitled to a DVCPO against Greenwood, the domestic relations court's decision to grant Halcomb a DVCPO is likewise affirmed. Greenwood's first assignment of error is overruled.

**Admissible Evidence: Audio and Video Recordings**

{¶ 48} Greenwood's Assignment of Error No. 2:

{¶ 49} THE TRIAL COURT ERRED WHEN IT ADMITTED EXHIBIT 8 OVER COUNSEL'S REPEATED OBJECTIONS.

{¶ 50} In his second assignment of error, Greenwood argues the domestic relations court erred by admitting into evidence the audio and video recordings offered by Halcomb to corroborate his testimony that Greenwood had been verbally, emotionally, physically, and financially abusive towards him. We disagree.

**Standard of Review**

{¶ 51} "Decisions regarding the admission of evidence are within the sound discretion of the domestic relations court and may not be reversed absent an abuse of discretion." *Koehler v. Koehler*, 12th Dist. Brown Nos. CA2017-12-016 and CA2017-12-017, 2018-Ohio-4933, ¶ 45, citing *Proctor v. NJR Properties, L.L.C.*, 175 Ohio App.3d 378, 2008-Ohio-745, ¶ 14 (12th Dist.). An abuse of discretion is more than an error of law or judgment; it implies that the domestic relations court's decision was unreasonable, arbitrary, or unconscionable. *Suwareh v. Nwankwo*, 12th Dist. Butler No. CA2017-12-174, 2018-Ohio-3737, ¶ 17, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "When applying the abuse-of-discretion standard, a reviewing court must not substitute its judgment for that of the trial court." *In re E.L.C.*, 12th Dist. Butler No. CA2014-09-177, 2015-Ohio-2220, ¶ 16.

**Authenticity of Audio and Video Recordings**

{¶ 52} Greenwood initially argues the domestic relations court erred by admitting the audio and video recordings "when most if not all of them were never properly authenticated." We find no merit to Greenwood's claim.

{¶ 53} Pursuant to Evid.R. 901(A), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." In accordance with Evid.R. 901(B)(1), the requirement of authentication or identification can be satisfied by testimony of a witness with knowledge "that a matter is what it is claimed to be." Authentication or identification can also be satisfied through voice identification under Evid.R. 901(B)(5) "whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

{¶ 54} "This threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity." *Morrison v. Robinson*, 12th Dist. Fayette No. CA2012-06-019, 2013-Ohio-453, ¶ 49. In other words, "[t]he authentication requirement contemplated by Evid.R. 901(A) invokes a very low threshold standard, requiring only sufficient foundational evidence for the trier of fact to conclude that the item is what the proponent claims it to be." *Weisbecker v. Weisbecker*, 12th Dist. Butler No. CA2005-10-421, 2006-Ohio-5840, ¶ 22, citing *Burns v. May*, 133 Ohio App.3d 351, 355 (12th Dist. 1999) ("[t]he evidence necessary to support a finding that the document is what a party claims it to be has a very low threshold, which is less demanding than the preponderance of the evidence").

**Analysis**

{¶ 55} After a full and thorough review of the record, we find no error in the domestic

relations court's decision to admit into evidence the audio and video recordings offered by

Halcomb. This is because, as the record indicates, Halcomb, a witness with knowledge of

the audio and video recordings, testified the recordings were accurate representations of

exchanges between himself and Greenwood that he downloaded from his computer in the

presence of his trial counsel. Specifically, as Halcomb testified:

> [HALCOMB'S TRIAL COUNSEL]: All of these, have you altered these tapes in any way?
>
> [HALCOMB]: No, I haven't.
>
> [HALCOMB'S TRIAL COUNSEL]: Did you alter the videos in any way?
>
> [HALCOMB]: No, I haven't.
>
> [HALCOMB'S TRIAL COUNSEL]: How did they get onto the computer at our office? Were you in our office when we downloaded them?
>
> [HALCOMB]: Yes.
>
> [HALCOMB'S TRIAL COUNSEL]: Were we in the room with you when we downloaded them?
>
> [HALCOMB]: Yes.
>
> [HALCOMB'S TRIAL COUNSEL]: Did you delete anything from them?
>
> [HALCOMB]: No.
>
> [HALCOMB'S TRIAL COUNSEL]: Are these accurate representations of exchanges between you and Mr. Greenwood?
>
> [HALCOMB]: Yes.

Thereafter, on cross-examination, Halcomb testified:

> [GREENWOOD'S TRIAL COUNSEL]: You've represented to the Court that the audio and visual, audio and video files that were played today were made by you and were unaltered in any way, correct[?]

[HALCOMB]: That's correct.

[GREENWOOD'S TRIAL COUNSEL]: They're consecutively numbered 1 through whatever the number is, correct?

[HALCOMB]: Yes.

[GREENWOOD'S TRIAL COUNSEL]: And so if I'm remembering correctly we had recordings that went all the way up to 62 or 63, is that right?

[HALCOMB]: I think so, yes.

[GREENWOOD'S TRIAL COUNSEL]: And you made 62 different audio recordings of Mr. Greenwood, correct?

[HALCOMB]: I believe so, yes.

{¶ 56} After a full and thorough review of the record, and considering the authentication requirement contemplated by Evid.R. 901(A) invokes a very low threshold standard, we find no error in the domestic relations court's decision finding the audio and video recordings offered by Halcomb were properly authenticated. This is true even though Halcomb did not specifically identify the voices on each individual audio recording or provide specific dates and times when each of the audio and video recordings were made. This is because, as noted above, Halcomb, a witness with knowledge of the audio and video recordings, testified the recordings being offered were accurate representations of exchanges between himself and Greenwood that he downloaded from his computer in the presence of his trial counsel.[4]

{¶ 57} In so holding, we note that Greenwood himself identified his and Halcomb's voices on several of the audio recordings, as well as on a number of the video recordings

---

4. This court has also reviewed the audio and video recordings in full. Upon review, we find nothing in the record to indicate the recordings are anything other than what Halcomb identified the recordings to be; namely, exchanges between himself and Greenwood.

submitted by Halcomb. For example, as it relates to two of the audio recordings played at the hearing before the magistrate, Greenwood testified "[t]hat sounds to be my voice, yes" and "[i]t appears to be [my voice], yes." Similarly, as it relates to the video recordings, Greenwood testified that it was his and Halcomb's voices on at least one of the video recordings; specifically, "[t]hat was me and that was him, yes." As to a different video recording, Greenwood testified "[t]hat is me, yes." Greenwood also testified that he recalled "very clearly" one of the incidents that was audio recorded and played at the hearing before the magistrate.

{¶ 58} Based on a full and thorough review of the record, we find the domestic relations court correctly determined the audio and video recordings offered by Halcomb were properly authenticated prior to their admission into evidence. In so holding, we note that any challenges to the recordings advanced by Greenwood went to the weight of the evidence and not to the admissibility of the audio and video recordings at issue. Greenwood's claim otherwise lacks merit.

**Admission of Duplicate Recordings**

{¶ 59} Greenwood next argues the domestic relations court erred by admitting duplicates of the audio and video recordings under Evid.R. 1003 rather than the originals as required by Evid.R. 1002. Greenwood claims this constitutes reversible error when considering he repeatedly raised a "genuine concern about the authenticity of the videos and audio recordings[.]" We disagree.

**Analysis**

{¶ 60} As noted above, any challenges to the audio and video recordings at issue go to the weight of the evidence and not to their admissibility. This includes Greenwood's claims that the recordings were just "snippets" of longer recordings between himself and

Halcomb. This is particularly true here when considering this matter was litigated before the bench, not a jury. "'Unless the record indicates otherwise, the judge is presumed to have considered only admissible evidence.'" *Stark County Park Dist. v. Dikerhoof*, 5th Dist. Stark No. 2017CA00231, 2018-Ohio-4319, ¶ 49, quoting *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, ¶ 27 (8th Dist.). There is nothing in the record indicating the domestic relations court took into consideration anything other than what was considered admissible, relevant evidence submitted by the parties. This includes the audio and video recordings at issue. Greenwood's claim otherwise again lacks merit.

**Harmless Error**

{¶ 61} We find no error in the domestic relations court's decision to admit into evidence the audio and video recordings at issue. But, even if we were to find error, we necessarily conclude that any error was harmless when considering the abundance of other evidence presented to support the domestic relations court's decision to grant Greenwood and Halcomb reciprocal DVCPOs. The testimony offered by Greenwood and Halcomb, coupled with the documentary evidence presented, supports the domestic relations court's decision to grant the reciprocal DVCPOs at issue. Pursuant to Civ.R. 61, "any error or defect in the proceeding which does not affect the substantial rights of the parties" must be disregarded as harmless error. That is certainly the case here. Therefore, finding any error the domestic relations court may have made in admitting into evidence the audio and video recordings at issue would constitute, at worst, harmless error, Greenwood's second assignment of error lacks merit and is overruled.

**Exclusive Occupancy of the Jointly-Owned Home**

{¶ 62} Halcomb's Assignment of Error No. 2:

{¶ 63} THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT RONALD

- 27 -

EXCLUSIVE OCCUPANCY OF THE RESIDENCE LOCATED [IN CLERMONT COUNTY], OHIO.[5]

{¶ 64} In Holcomb's second assignment of error, Halcomb argues the domestic relations court erred by failing to grant him exclusive occupancy of the home he and Greenwood jointly hold in trust. We disagree.

{¶ 65} Pursuant to R.C. 3113.31(E)(1)(b), after either an ex parte or full hearing, the domestic relations court may "grant possession of the residence or household to the petitioner or other family or household member, to the exclusion of the respondent[.]" This is true even "when the residence or household is jointly owned or leased by the respondent, and the petitioner or other family or household member[.]" However, although the home is jointly held in trust by Greenwood and Halcomb, and while it appears Greenwood and Halcomb have significant difficulties being in close physical proximity to one another, we find no error in the domestic relations court's decision to deny Halcomb exclusive occupancy of the home.

{¶ 66} The domestic relations court, after reviewing the record, determined that granting either Greenwood or Halcomb exclusive occupancy of the home was not appropriate in this case. "R.C. 3113.31 expressly authorizes a trial court to tailor the scope of a DVCPO to the circumstances of each case, and a trial court is afforded discretion in establishing the scope of the order." *Denny v. Sanders*, 1st Dist. Hamilton No. C-150556, 2016-Ohio-5113, ¶ 18. Therefore, while this court may have found granting either Greenwood or Halcomb exclusive occupancy of the home was a more appropriate remedy, we should not, and will not, substitute our judgment for that of the domestic relations court

---

5. This court removed the specific address of the Clermont County, Ohio home to protect the privacy of the parties.

in tailoring the scope of the reciprocal DVCPOs in this case. Accordingly, because we find no error in the domestic relations court's decision to deny Halcomb exclusive occupancy of the home, Halcomb's second assignment of error lacks merit and is overruled.

{¶ 67} In so holding, just as the domestic relations court noted in its decision to grant Greenwood and Halcomb reciprocal DVCPOs, we note that if either of the parties wish to divest themselves of their interest in the home, they should seek relief through a partition action with a court of competent jurisdiction. It does not appear from the record before this court that either Greenwood or Halcomb has sought such relief to divest themselves from their interest in the home. Given their tumultuous relationship and purported desire to now go their separate ways, this court believes this course of action is appropriate to sever their relationship and distance themselves from the potential for any future altercations – physical or otherwise.

**Parties Ordered to Stay 500 Feet Apart**

{¶ 68} Greenwood's Assignment of Error No. 3:

{¶ 69} THE TRIAL COURT ERRED WHEN IT FASHIONED SCOTT'S PROTECTION ORDER TO ALLOW BOTH PARTIES ACCESS TO THE RESIDENCE WHILE REQUIRING THEM TO REMAIN 500 FEET APART.

{¶ 70} In his third assignment of error, Greenwood argues the domestic relations court erred by ordering the parties to stay at least 500 feet apart while still allowing both access to the home. We agree that such an order is untenable given the unique facts and circumstances of this case. Therefore, while this court finds no error in the domestic relations court's decision to deny both Greenwood and Halcomb exclusive occupancy of the home, we nevertheless find it necessary to remand this matter to the domestic relations court to craft an order that is more suitable given the complicated nature of Greenwood and

Halcomb's relationship coupled with a joint interest in the home.

{¶ 71} This court has the authority to modify the domestic relations court's decision. This is because, as provided by Section (3)(B)(2), Article IV of the Ohio Constitution, appellate courts have jurisdiction to "affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district."  However, because the domestic relations court has had the opportunity to engage more fully with the parties, we believe that the domestic relations court is better suited to take on this responsibility by modifying its prior decision to fit more fully within the unique facts and circumstances of this case.

{¶ 72} Given the contentious nature of this litigation, as well as the volatile nature of the parties' relationship, neither Greenwood nor Halcomb will be fully satisfied with the domestic relations court's decision.  The domestic relations court must nevertheless exercise its sound discretion in reaching a decision that it deems equitable and just – ordering Greenwood and Halcomb to stay at least 500 feet away from one another while still allowing both parties access to the home does neither.  We find this necessary because, as the record indicates, both parties would undoubtedly go to great lengths to deny the other party access to the home.  This includes what can best be described as "squatting" in an attempt to circumvent the domestic relations court's decision to deny both Greenwood and Halcomb exclusive occupancy of the home.  Therefore, Greenwood's third assignment of error is sustained and this matter is reversed and remanded for further proceedings.

{¶ 73} Judgment reversed and remanded.


PIPER and M. POWELL, JJ., concur.