[Cite as *W.B. v. T.M.*, 2020-Ohio-853.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| W.B. | C.A. No. 19CA011474 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| T.M. | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 18DV085070 |

DECISION AND JOURNAL ENTRY

Dated: March 9, 2020

TEODOSIO, Presiding Judge.

{¶1} T.M. appeals a judgment of the Lorain County Court of Common Pleas, Domestic Relations Division, that granted a domestic violence civil protection order to W.B. For the following reasons, this Court reverses.

I.

{¶2} T.M. and W.B. are the mother and father, respectively, of two girls. They divorced in 2013 and have a shared parenting plan. Both Mother and Father have repeatedly and intentionally violated the parenting time schedule without justification. The issue came to a head on Friday, September 14, 2018, when Mother was supposed to pick the girls up from Father's house at 5:00 p.m. Because Mother had a history of refusing to return the children to Father on Sunday evenings, Father sent a message to Mother demanding that she promise in writing to return the girls on Sunday. Mother did not answer the message, so when she arrived at Father's house in a car being driven by her husband, Father refused to send the girls out.

{¶3}   After sitting in Father's driveway for some time, Mother called the police.  She also had her husband pull their car into the street.  When the police arrived, they performed a well check on the children and explained to Mother that, because the girls were safe, they would not otherwise intervene in the matter.  Mother and her husband continued waiting in the street.  According to Mother, Father would sometimes relent in their standoffs and send the girls out later in the evening.

{¶4}   Around 5:45 p.m., Father left his residence with the girls, his wife, and his wife's children in order to drop his wife's children off with their father.  After starting down the street, Mother and her husband began following Father.  According to Father, he obeyed the 25 miles per hour speed limit and turned down a number of roads, but Mother and her husband continued to follow them for a long while.  According to Mother, she thought that there was a chance that Father was taking the girls to the police station to make the exchange, so she had her husband continue behind Father until it was clear that he was not going to the police station.  Mother also testified that her husband kept a car's length distance behind Father as they proceeded and was only immediately behind him at stop signs.

{¶5}   After Mother decided to stop following Father, she had her husband return to the street outside Father's residence to wait for him.  Father dropped his wife's children off and then, observing that Mother was back in front of his house via his front door video camera, decided to go to a restaurant instead of returning home.  During their meal, one of the girls sent Mother a message on her cell phone that they had gone to dinner.  Mother and her husband, therefore, left Father's street.

{¶6}   Around 9:00 p.m., Mother and her husband returned to Father's home and had the police perform another well check on the children.  She returned to the house on Saturday

morning and was able to visit with the girls for a minute after the police made another well check. Meanwhile, Mother posted some of her thoughts about the evening and a video that her husband recorded on her Facebook page. The content was publicly available, but she had blocked Father from viewing her posts. He was able to view the submissions, however, by using a second account that he had created that Mother did not know about.

{¶7} Based on Mother's conduct, Father petitioned for a domestic violence civil protection order. A magistrate issued an ex parte order that covered Father, the girls, and the children of Father's wife, and scheduled a hearing on the issue. Following the hearing and in camera interviews with the girls, the trial court issued a domestic violence civil protection order, finding that Mother engaged "in a pattern of conduct in which to cause distress to [Father] for his and his family's safety." The Court removed the children of Father's wife as protected parties. Mother has appealed, assigning five errors.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING THE PETITION FOR DVCPO ABSENT ANY EVIDENCE OF DOMESTIC VIOLENCE AS DEFINED BY OHIO REVISED CODE SECTION 3113.31.

{¶8} In her first assignment of error, Mother argues that the trial court incorrectly granted a protection order to Father and the girls. A court may issue a domestic violence civil protection order to bring about a cessation of domestic violence against the petitioner, his family, or members of his household. R.C. 3113.31(E)(1). The decision whether to issue a protection order is within the discretion of the trial court. *Lundin v. Niepsuj*, 9th Dist. Summit No. 28223, 2017-Ohio-7153, ¶ 19. "When the trial court exercises its discretion, however, it must find that the petitioner has shown by a preponderance of the evidence that the petitioner or petitioner's

family or household members are the victim of, or in danger of, domestic violence." *Id.* "Consequently, as in other civil cases, we review the evidence underlying protection orders to determine whether sufficient evidence was presented or whether the protection order is against the manifest weight of the evidence." *Id.*, quoting *A.S. v. P.F.*, 9th Dist. Lorain No. 13CA010379, 2013-Ohio-4857, ¶ 4.

{¶9} The domestic violence that the trial court found existed appears to be under R.C. 3113.31(A)(1)(a)(ii), which relates to "committing a violation of section 2903.211 of the Revised Code." R.C. 2903.211 addresses the criminal offense of menacing by stalking and provides, in relevant part, that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person." R.C. 2903.211(A)(1). The trial court found that Mother "did engage in a pattern of conduct in which to cause distress to [Father] for his and his family's safety."

{¶10} Regarding the terms used in R.C. 2903.211(A), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Mental distress" means either "[a]ny mental illness or condition that involves some temporary substantial incapacity" or (2) "[a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received [those] services." R.C. 2903.211(D)(2). "Incapacity is substantial if it has a significant impact upon the victim's daily life." *State v. Willett*, 9th Dist.

Summit No. 25521, 2012-Ohio-1027, ¶ 10, quoting *State v. Payne*, 178 Ohio App.3d 617, 2008-Ohio-5447, ¶ 9 (9th Dist.). "Mere mental stress or annoyance does not constitute mental distress for purposes of the menacing by stalking statute." *Morton v. Pyles*, 7th Dist. Mahoning No. 11 MA 124, 2012-Ohio-5343, ¶ 15; *Mullen* at ¶ 15.

{¶11} Mother argues that there was no evidence that she knowingly caused mental distress to Father or knowingly caused him to fear physical harm. She also argues that there was no evidence that she was aware that her conduct was causing mental distress to Father or that her conduct would reasonably lead to mental distress in Father. Regarding the content that was posted to her Facebook page, Mother notes that she had blocked Father from her page and the trial court had previously instructed Father not to view her social media accounts. Mother asserts that she never made any direct or indirect threats to Father either in person or on social media and that Father never testified that he was afraid of her. She argues that the only content she posted about Father on her Facebook page concerned his noncompliance with the parenting time order. She further argues that she never encouraged any of the people who viewed her messages to take any action against Father. According to Mother, she was merely seeking emotional support from her friends.

{¶12} Regarding whether Father experienced mental distress, Mother argues that Father did not present any evidence that her conduct caused him such distress. She alleges that he did not describe any type of distress that he suffered except for his statements that he was afraid of what the followers of her Facebook page could do to him since the video she posted contained his address. Mother argues that Father's fears were unreasonable in light of the fact that his address is publicly available from the trial court's online docket and the county auditor's website.

{¶13} Father argues that he established by a preponderance of the evidence that Mother engaged in a pattern of conduct that knowingly caused him to believe that she would cause physical harm or mental distress to him or his family members. He argues that she knowingly chased him and his family after they left their home and followed closely behind them as they traversed 13 separate streets. She then went back to their house and sat outside it for 45 minutes. She later returned to the house again and recorded a video that she posted on Facebook. Father argues that Mother had a pattern of posting vitriolic items on Facebook that ridiculed and invited hostile comments about him. He argues that the evidence established that all of that conduct caused him great mental distress and fear.

{¶14} Upon review of the record, we conclude that there was insufficient evidence to support a finding that Mother knowingly caused Father "mental distress" as that term is defined in R.C. 2903.211(D)(2). Initially, we note that Mother's Facebook page postings do not support a finding that she committed a violation of R.C. 2903.211(A)(1) because it was undisputed that Mother had blocked Father from viewing her page and the trial court had advised Father not to view Mother's social media content. There is also no evidence in the record that Mother knew or suspected that Father had created a second account to keep apprised of her online activity.

{¶15} The fact that Mother followed Father's vehicle at a slow rate of speed through the neighborhoods near his home also does not establish that Mother knowingly caused Father mental distress. It must be taken into consideration that, at the time of the alleged "chase," Father was in active noncompliance with the parties' parenting time order and was driving the parties' children away in his vehicle instead of delivering them to Mother. There is no evidence that Father told Mother where he was taking the girls before he left his residence. There is also no evidence that Mother's husband tailgated Father through the neighborhoods, that Mother or

her husband made any sort of gestures or threats at Father as they followed him, or that any of the parties were at any greater risk of physical harm than is inherent to the operation of a motor vehicle. Father's testimony that he was "scared" and "nervous" during the incident does not rise to the level of "temporary substantial incapacity" or establish that Father experienced a "mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services[.]" R.C. 2903.211(D)(2); *Morton*, 2012-Ohio-5343, at ¶ 15.

{¶16} Mother's Facebook postings could be used to establish menacing by stalking under R.C. 2903.211(A)(2)(b) even if they were not viewed by Father. That section provides that "[n]o person, through the use of * * * any electronic method of remotely transferring information * * * shall post a message * * * with purpose to * * * [u]rge or incite another to commit a violation of division (A)(1) of this section." We note, however, that the trial court did not find that Mother committed a violation of that section. Mother's first assignment of error is sustained.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DESIGNATING THE PARTIES' MINOR CHILDREN AS PROTECTED PARTIES UNDER THE JANUARY 16, 2019 DVCPO.

{¶17} In her second assignment of error, Mother argues that the trial court incorrectly included the parties' children in its protection order. She argues that the court did not find that the girls were endangered or that her conduct created a substantial risk of harm to their safety and well-being. She also argues that Father presented very little evidence about the effect of her conduct on the girls.

{¶18} Father argues that, since the girls were in the vehicle with him as Mother and her husband followed him, they experienced the same fearfulness. He notes that the trial court

conducted an in-camera interview with the girls and, thus, this Court should presume that including the girls in the protection order was appropriate. He also argues that they live at the residence that was the focus of the video Mother posted to her Facebook page, which puts them at the same risk from Mother's followers as him. Mother also admitted that one of the girls follows her on Instagram and would be embarrassed by the posts that Mother makes on Instagram.

{¶19} Upon review of the record, we note that, although the trial court interviewed the girls in camera, it did not find that they were victims of domestic violence separate from what Father had experienced. Instead, it appears that the trial court included the girls as protected parties because Mother's pattern of conduct had caused Father "distress * * * for his and his family's safety." As previously addressed, Father did not present sufficient evidence to establish that he was or was in danger of becoming a victim of domestic violence. Consequently, we conclude that the trial court abused its discretion when it issued a domestic violence civil protection order that included the girls as protected parties. Mother's second assignment of error is sustained.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN CONDUCTING AN IN-CAMERA INTERVIEW OF THE MINOR CHILDREN IN A DVCPO PROCEEDING.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION IN RESTRAINING THE APPELLANT FROM HAVING ANY CONTACT WITH THE PARTIES' MINOR CHILDREN OTHER THAN SUPERVISED TELEPHONE CONTACT.

ASSIGNMENT OF ERROR V

THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS
DISCRETION IN GRANTING APPELLEE AN EX PARTE DVCPO UNDER
THE FACTS AND CIRCUMSTANCES OF THIS CASE.

{¶20}  In her third assignment of error, Mother argues that the trial court erred when it conducted an in-camera interview with the girls.  In her fourth assignment of error, Mother argues that the protective order issued by the trial court was too restrictive.  In her fifth assignment of error, Mother argues that the trial court improperly awarded father an ex parte domestic violence civil protection order.  In light of this Court's resolution of Mother's first and second assignments of error, Mother's third, fourth, and fifth assignments of error have been rendered moot.  We, therefore, decline to address them.  App.R. 12(A)(1)(c).

III.

{¶21}  We do not condone the conduct of either of the parties, especially their flagrant violations of the parenting time order.  Father's evidence, however, was insufficient to establish that Mother committed domestic violence against him or the girls.  Mother's first and second assignments of error are sustained.  We do not reach Mother's third, fourth, and fifth assignments of error because they are moot.  The judgment of the Lorain County Court of Common Pleas, Domestic Relations Division, is reversed.

Judgment reversed.

―――――

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JOSEPH G. STAFFORD, Attorney at Law, for Appellant.

BRENT L. ENGLISH, Attorney at Law, for Appellee.