[Cite as *Pinkston v. White*, 2019-Ohio-5165.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


MICHAELA PINKSTON,                    :

    Appellee,                     :         CASE NO. CA2019-06-094

    - vs -                         :         O P I N I O N
                                            12/16/2019
                                   :

AARON WHITE,                          :

    Appellant.                    :


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No.  DV18-08-0420


Legal Aid Society of Southwest Ohio, Alexandra Winters, 10 Journal Square, 3rd Floor, Hamilton, Ohio 45011, for appellee

Berry & Karl, LLC, Kristie A. Karl, 312 Walnut Street, Suite 1600, Cincinnati, Ohio 45202, for appellant


**PIPER, J.**

{¶ 1}   Respondent-appellant, Aaron White, appeals from the decision of the Butler County Court of Common Pleas, Domestic Relations Division, granting a domestic violence civil protection order ("DVCPO") against him in favor of petitioner-appellee, Michaela

Pinkston. For the reasons outlined below, we affirm the trial court's decision.[1]

{¶ 2} In August 2017, Pinkston and White began a sexual relationship, which resulted in the birth of A.W. in July 2018. Thereafter, on August 6, 2018, Pinkston petitioned for, and was granted, an ex parte DVCPO for herself and A.W. In the petition, Pinkston alleged that an altercation occurred between the parties when she went to White's home to retrieve some of A.W.'s belongings. Upon arriving at White's home, Pinkston discovered that a "friend" of White's, who was later identified as White's girlfriend, was present. According to Pinkston, she was conversing with White's girlfriend when White suddenly began "choking" Pinkston and attempted to "slam" her to the ground. Pinkston stated White continued to choke her and dug his nail into her skin. She further alleged that White said "I will break your face" and tried to "bang" her head against a trailer. Pinkston then claimed White took A.W. from his "seat" and would "not give him back" until the police arrived. Pinkston stated she was afraid to take A.W. away from White without police assistance.

{¶ 3} In October 2018, a two-day final domestic violence hearing was held before a magistrate. Pinkston, White, White's mother, White's neighbor, White's girlfriend, and one of the responding officers testified at the hearing. After the hearing, the magistrate denied Pinkston's request for a DVCPO and dismissed the ex parte DVCPO on the merits. In her written decision, the magistrate found that Pinkston had failed to prove, by the preponderance of the evidence, that White engaged in acts or behaviors that constituted domestic violence as defined in R.C. 3113.31(A)(1)(a) and/or R.C. 3113.31(A)(1)(b). The trial court then adopted the magistrate's denial of the DVCPO and ordered the ex parte DVCPO to be dismissed for lack of evidence. Pinkston filed objections to the dismissal of her request for a DVCPO. In her objections, Pinkston argued the trial court erred in dismissing

---

1. Pursuant to Loc.R. 6(A), we sua sponte remove this case from the accelerated calendar for the purpose of issuing this opinion.

her petition because White's actions constituted domestic violence as defined in R.C. 3113.31(A)(1)(a)(i), as the evidence showed White attempted to cause bodily harm to Pinkston. Pinkston further claimed that the magistrate's decision mischaracterized the testimony provided by White's neighbor and failed to give "enough weight" to the testimony of an unbiased witness.

{¶ 4} After a hearing, the trial court overruled the decision denying the final DVCPO, finding that a denial of a DVCPO was inappropriate based on the facts in evidence and the transcript of the hearing. As such, the trial court issued a DVCPO and named Pinkston as the sole person protected by the order.

{¶ 5} White now appeals, raising two assignments of error. For ease of discussion, White's assignments of error will be addressed together.

{¶ 6} Assignment of Error No. 1:

{¶ 7} THE TRIAL COURT ERRED AS A MATTER OF LAW BY REVIEWING THE MAGISTRATE'S DENIAL OF DVCPO PURSUANT TO CIV.R. 53.

{¶ 8} Assignment of Error No. 2:

{¶ 9} THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT OVERRULED THE MAGISTRATE'S DENIAL OF A CIVIL PROTECTION ORDER AND ISSUED A CIVIL PROTECTION ORDER.

{¶ 10} White initially argues the trial court erred in denying the DVCPO pursuant to Civ.R. 53, rather than the applicable Civ.R. 65.1. Specifically, White claims the trial court improperly conducted a de novo review pursuant to Civ.R. 53 and therefore applied the wrong standard of review in ruling on Pinkston's objections.

{¶ 11} In the instant matter, the trial court granted Pinkston a DVCPO pursuant to R.C. 3113.31. The rules governing civil protection orders are set forth in Civ.R. 65.1. According to Civ.R. 65.1(F)(3), civil protection petitions may be referred to a magistrate for determination,

but "[a] magistrate's denial or granting of a protection order after full hearing * * * does not constitute a magistrate's order or a magistrate's decision under Civ.R. 53(D)(2) or (3) and is not subject to the requirements of those rules." Civ.R. 65.1(F)(3)(b).

{¶ 12} A magistrate's order granting a protection order after a full hearing is not effective unless adopted by the trial court. Civ.R. 65.1(F)(3)(c)(i). A trial court may only adopt the magistrate's grant or denial of a protection order "upon review of the order and a determination that there is no error of law or other defect evident on the face of the order." Civ.R. 65.1(F)(3)(c)(ii). *See also Wulf v. Opp,* 12th Dist. Clermont No. CA2014-10-074, 2015-Ohio-3285, ¶ 17. A party may then file written objections "to a court's adoption, modification, or rejection of a magistrate's denial or granting of a protection order after a full hearing * * * within fourteen days of the court's filing of the order." Civ.R. 65.1(F)(3)(d)(i). A party must timely file objections prior to filing an appeal. Civ.R. 65.1(G).

{¶ 13} The objecting party "has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Civ.R. 65.1(F)(3)(d)(iii). "Objections based upon evidence of record shall be supported by a transcript of all the evidence submitted to the magistrate or an affidavit of that evidence if a transcript is not available." Civ.R. 65.1(F)(3)(d)(iv).

{¶ 14} In the instant matter, the record reflects the magistrate cited Civ.R. 65.1 in denying the DVCPO on November 20, 2018, a ruling which was adopted by the trial court the same day. Pinkston then timely objected to the trial court's adoption in accordance with Civ.R. 65.1(F)(3)(d)(i). However, in its decision and order ruling upon Pinkston's objections, the trial court only referenced Civ.R. 53, which requires the trial court to conduct an independent review as to the objected matters. As such, the trial court considered the

magistrate's findings, the transcript and evidence provided, and the arguments of the parties prior to ruling upon Pinkston's objections.

{¶ 15} On appeal, White argues the trial court erred in conducting its own independent review before ruling on Pinkston's objections because orders issued pursuant to Civ.R. 65.1 are not subject to Civ.R. 53. However, while it is true that domestic violence civil protection orders are governed by Civ.R. 65.1, the rule does not preclude the trial court from engaging in a de novo or independent review of the record prior to ruling on a party's objections. Rather, the rule implies that an independent review of the record by the trial court is required. Specifically, pursuant to Civ.R. 65.1, Pinkston had the burden of proving that "an error of law or other defect [wa]s evident on the face of the [magistrate's] order, or that the credible evidence of record [wa]s insufficient to support the denial of the protection order[.]" Due to the nature of her objections, that is, because they were based upon evidence in the record, Pinkston was also required to support her objections with a transcript of "all the evidence submitted to the magistrate." Civ.R. 65.1(F)(3)(d)(iv). By requiring Pinkston to support her objections with evidence from the record, the rule itself suggests that the trial court must independently review such evidence before ruling upon Pinkston's objections. Therefore, it would be inconsistent with Civ.R. 65.1 to prohibit the trial court from conducting an independent de novo review of the record prior to ruling on Pinkston's objections.

{¶ 16} Furthermore, the implication of an independent review by the trial court is also supported by the recent amendment of Civ.R. 65.1(G), which requires a party to file objections prior to appealing from the trial court's adoption of the magistrate's ruling. According to the Staff Notes accompanying Civ.R. 65.1, subsection (G) was amended to require a party to file objections in order to "promote[] the fair administration of justice, including *afforing the trial court an opportunity to review the transcript and address any insufficiency of evidence or abuse of discretion that would render the order * * * unjust.*"

(Emphasis added.) In light of this language, it appears one purpose of filing objections pursuant to Civ.R. 65.1 is to afford the trial court an opportunity to conduct an independent review of the evidence.

{¶ 17} Although the trial court, at times, mistakenly referenced Civ.R. 53 in ruling on Pinkston's objections, we find that this mistake did not result in reversible error. *See Tilbrook v. Francis*, 12th Dist. Warren No. CA2017-06-091, 2018-Ohio-4064, ¶ 19 (finding no reversible error where the trial court referenced Civ.R. 53 when ruling on objections to a DVCPO ruling, but otherwise complied with Civ.R. 65.1). Despite its mistake, the manner in which the trial court handled Pinkston's objections complied with the requirements of Civ.R. 65.1. Therefore, we find the trial court applied the correct standard of review in ruling on Pinkston's objections.

{¶ 18} White next argues that the trial court improperly "substituted its judgment on the credibility and believability" of the witnesses and that its decision granting a DVCPO was against the manifest weight of the evidence and contrary to law. Similarly, White also argues that Pinkston failed to meet her burden of proving that the credible evidence of record was insufficient to support the initial denial of the DVCPO.

{¶ 19} Pursuant to R.C. 3113.31, in order to obtain a DVCPO, "the petitioner must prove by a preponderance of the evidence that the respondent has engaged in an act of domestic violence against petitioner, petitioner's family, or petitioner's household members." *McBride v. McBride*, 12th Dist. Butler No. CA2011-03-061, 2012-Ohio-2146, ¶ 12, citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. "Preponderance of the evidence" means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence. *Halcomb v. Greenwood*, 12th Dist. Clermont Nos. CA2018-03-008, CA2018-03-010, CA2018-03-012 and CA2018-03-013, 2019-Ohio-194, ¶ 3, citing *Eckstein v. Colian*, 7th Dist.

- 6 -

Columbiana No. 11 CO 22, 2012-Ohio-4038, ¶ 14.

{¶ 20} As defined by R.C. 3113.31(A)(1)(a), as relevant here, the phrase "domestic violence" means the occurrence of one or more of the following acts against a family or household member:

> (i) Attempting to cause or recklessly causing bodily injury;
>
> (ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [menacing by stalking] or 2911.211 [aggravated trespass] of the Revised Code[.]

{¶ 21} "A trial court's decision to deny or grant a [DV]CPO will not be reversed where such decision is supported by the manifest weight of the evidence." *Glancy v. Spradley*, 12th Dist. Butler No. CA2012-02-024, 2012-Ohio-4224, ¶ 8. Under a manifest weight challenge, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Schneble v. Stark*, 12th Dist. Warren Nos. CA2011-06-063 and CA2011-06-064, 2012-Ohio-3130, ¶ 67; *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶ 22} At the full hearing, Pinkston testified that she felt White was going to hurt or kill her. This belief was based, in part, on an incident which occurred on August 5, 2018. Pinkston testified that she went to White's home that evening to retrieve "baby stuff." When she arrived, White and White's girlfriend, Dawnie Komotios, were in White's garage. At that point, White, Komotios, and Pinkston began arguing about the nature and duration of White and Komotios' relationship. During the argument, Pinkston testified White "came full-fledged" at her, choked her, and held her against his trailer. Pinkston indicated White "had [her] pinned up against the trailer" before she was able to break free. She further indicated that

White continued "grabbing" and "yanking" on her, which resulted in his nail digging into her skin. At that point, White went to Pinkston's car, grabbed A.W., and fought with Pinkston to remove A.W. from the car. White ultimately took A.W. and sat on the floor of the garage until the police arrived.

{¶ 23} Pinkston further testified that she sustained injuries as a result of the incident and photographs documenting her injuries were submitted into evidence. Pinkston described her injuries as bruising on her arms in the shape of a handprint, marks on her neck and skin from where White's nail dug into her skin, and red marks on her neck. Pinkston stated she sought medical attention for those injuries "some hours" after the incident.

{¶ 24} The court also heard the testimony of White's neighbor, Lindsay Holliday, who lived across the street from White. Holliday indicated she was unfamiliar with Pinkston, but had seen White every day "out front or in his garage" for approximately two years. According to Holliday, she was in bed when she heard "banging that seemed unusual." At that point, she got up, looked out her second-story bedroom window, and saw "the struggle between the two people." The neighbor then described "the struggle," and indicated "[White] was slamming [Pinkston] repetitively into the side of the trailer - - which was the sound that [she] heard." Although Holliday was "so alarmed [she] didn't count" the amount of time she witnessed White "slam" Pinkston into the trailer, she testified it was "more than just several." According to Holliday, although it was dark at the time of the incident, she was "positive" that it was White doing the "slamming." She also confirmed she had no doubt that she witnessed White slamming Pinkston into the trailer.

{¶ 25} Holliday further testified that, because she was afraid someone was going to get hurt, she called 9-1-1. At that point, a recording of the neighbor's 9-1-1 call was played for the court, which was transcribed into the record. On the recording, Holliday told the dispatcher that there was a "domestic issue" directly across the street from her home. She

further stated: "They're fighting and he's slamming her into the side of a trailer" and that there was a car "parked out front," the garage door was open, and there was a trailer parked in the driveway that White was slamming Pinkston against. The dispatcher then asked Holliday if the woman was injured, to which Holliday responded, "Um, I can't real – No, I can't really see very well and I don't wanna go outside." After making the 9-1-1 call, Holliday continued watching from her windows because she was "really worried somebody was gonna get hurt really bad." The neighbor then indicated that, as she continued watching, "the struggle continued," and that she observed Pinkston and White go to the car and struggle over a "pumpkin seat."

{¶ 26} The court then heard testimony from White, who testified that he had never been physically violent with Pinkston and offered his version of the altercation on August 5, 2018. Specifically, White indicated that when Pinkston unexpectedly showed up at his residence she was "irate," screaming, and cussing at White. According to White, Pinkston was making a scene and then came toward his garage where his girlfriend, Komotios, was standing. At that point, White testified he put his hands out, stopped Pinkston, and restrained her by "pushing her back[.]" While White was restraining Pinkston, Pinkston was "swinging on [him;]" however, he failed to inform the officers of Pinkston's "swinging." White further admitted that Pinkston fell on the ground while he was restraining her; however, White stated he only restrained Pinkston to stop her from coming into the garage. White reiterated in his testimony that he never hit or slammed Pinkston against the side of the trailer.

{¶ 27} In the midst of the struggle, White called the police and informed them that he was taking A.W. to the garage. According to White, when the police arrived both parties stated they had not been injured or physically harmed. At that point, the police told White to return A.W. to Pinkston, which he did. At the hearing, White estimated the altercation lasted approximately 10 minutes before the police arrived.

{¶ 28} White also offered testimony from Officer Carter, who was one of the two officers who responded to the scene. The officer testified that when he arrived at the residence, the parties were separated, and he spoke with Pinkston. According to the officer, Pinkston indicated she was not injured or assaulted, but that she was upset because she needed help with A.W. The officer testified he did not see any visible injuries on Pinkston that evening, and that she did not request medical attention. The officer further stated that he did not interview or otherwise follow up with the 9-1-1 caller.

{¶ 29} Komotios and White's mother also testified on White's behalf. Komotios testified that she was present during the altercation and never saw White slam Pinkston into the trailer. Rather, she indicated that Pinkston arrived at White's residence and started arguing with Komotios and White regarding their relationship. During the argument, Pinkston came toward Komotios and at that point, White put his arm out and Pinkston went "crazy," "swinging and kicking" while he was "restraining" her. Komotios then testified that White ultimately released Pinkston, and Pinkston said "I'll tell them you hit me." After being released, Pinkston attempted to enter the garage a second time and White restrained her again, "taking her like against the trailer[.]" White's girlfriend then indicated White attempted to take A.W. from the car, which prompted another struggle between the parties. At that point, White called the police. Komotios admitted she did not inform the officers that Pinkston attempted to come after her twice. White's mother testified that on the evening of the incident White called her because Pinkston was "going crazy" and talking to Komotios. Similar to Komotios' testimony, White's mother indicated she heard someone say, "I'm gonna tell the police you hit me." According to White's mother, her call with White lasted a few minutes and she arrived at White's residence a few minutes later. Neither White's mother nor Komotios saw any injuries on either party the night of the incident.

{¶ 30} After hearing the above testimony, the magistrate concluded that the testimony

of Officer Carter and Komotios was "very credible," and that Pinkston's testimony was "simply not credible." The magistrate further discounted the testimony of White's neighbor, as she only saw a small portion of the incident where White was holding Pinkston against the trailer to prevent harm to White's girlfriend. As such, the magistrate found that Pinkston was the aggressor in the matter and that she had failed to carry her burden in proving that domestic violence occurred. After reviewing the record and Pinkston's objections, the trial court overruled the magistrate's determination. Specifically, the trial court found that the evidence of the "only unbiased witness at the hearing [Holliday] was corroborated by Ms. Pinkston's testimony of the events. [Pinkston's] testimony was further corroborated by visible injuries entered into evidence." Based on those findings, the trial court concluded Pinkston showed by a preponderance of the evidence that White "recklessly caused bodily injury to Ms. Pinkston, and placed her in fear of imminent serious physical harm by 'slamming her head into the van' thus engaging in domestic violence in violation of ORC3113.31."

{¶ 31} After reviewing the record, we find that Holliday's and Pinkston's testimony, if believed, prove by a preponderance of the evidence that White engaged in an act of domestic violence against Pinkston. As such, we find the trial court's decision granting the DVCPO was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 32} As noted above, White initially argues the trial court wrongfully substituted its judgment for that of the magistrate and discounted the credibility determination regarding the testimony of Pinkston and Holliday. "Civ. R. 65.1(F)(3)(c)(iii) gives the court the authority to modify or reject the magistrate's order, without any restrictions on the court's ability to reach its own conclusions concerning credibility." *Bressler v. Nunemaker*, 5th Dist. Licking No. 17-CA-06, 2017-Ohio-5804, ¶ 9. However, when a trial court judge commits credibility determinations to a magistrate, the presumption that a subsequent credibility determination

made by the trial court is correct is lessened. *Kubin v. Kubin*, 140 Ohio App. 3d 367, 371 (12th Dist.2000). Regardless, the presumption that the trial court is correct in its judgment still exists. *Id.* "As the ultimate factfinder, the trial court judge decides whether the magistrate has properly determined the factual issues and appropriately applied the law, and where the magistrate has failed to do so, the trial court must substitute its judgment for that of the magistrate." *Patridge v. Matthews*, 12th Dist. Brown No. CA2000-04-007, 2001-Ohio-4207, *5. Therefore, in this case, the trial court was not required to give deference and weight to the magistrate's ruling or its determinations regarding Pinkston's and Holliday's credibility. As a result, we find no error in the weight given to the testimony of Pinkston and Holliday by the trial court.

{¶ 33} We also reject White's argument that the trial court's finding that White engaged in domestic violence in violation of R.C. 3113.31 when he slammed Pinkston's head into the "van" is unsupported by the record. As an initial note, we find the trial court's reference to a "van," as opposed to a trailer, is immaterial to its finding that White slammed Pinkston into an object and therefore engaged in domestic violence. That said, the record reflects that the term "slamming" was consistently used to describe the incident. Specifically, Holliday repeatedly referenced White "slamming" Pinkston into the trailer during her testimony. This includes testimony that Holliday told the 9-1-1 operator that "[t]hey're fighting and he's slamming her into the side of a trailer," a description of the struggle as White slamming Pinkston repetitively into the side of the trailer, and testimony that Holliday was positive White was doing the slamming and the noise from the slamming caused her to look out the window. While White argues neither he nor Pinkston referred to "slamming" during their testimony, Holliday's testimony is consistent with that of Pinkston and Komotios, who indicated that, in an effort to restrain Pinkston, White was "taking [Pinkston] like against the trailer" and that White "had [Pinkston] pinned against the trailer." As discussed above, the

trial court found Holliday's testimony, as an unbiased witness, very credible and we find no error in the weight given to Holliday's testimony by the trial court. Accordingly, if believed, Holliday's testimony establishes that White repeatedly "slammed" Pinkston against the trailer.

{¶ 34} Similarly, we disagree with White's claim that the record does not reflect that Pinkston was injured as a result of White's actions. The record reflects Pinkston testified that she sustained bruises in the shape of handprints, red marks on her neck, and that White's nail dug into her skin and neck. Although Pinkston informed Officer Carter that she had not been injured as a result of the incident, Officer Carter testified that, at the time of their interview, Pinkston was excited from the argument and A.W. remained with White in the garage. Moreover, despite her indication she had not been injured, Pinkston testified she ultimately sought medical attention shortly after the incident and took "picture[s] from * * * the incident from when he grabbed [her] arm." Those photographs were admitted into evidence. Pinkston also sought a protection order the day after the incident occurred. As such, we find the record adequately reflects that Pinkston was injured and placed in fear of imminent serious physical harm the night of the incident.

{¶ 35} Based on the facts in evidence and the transcript of the hearing, we find, like the trial court, that granting the DVCPO was appropriate in this case. Stated differently, pursuant to Civ.R. 65.1(F)(3)(d)(iii), we find the credible evidence of record was insufficient to support the initial denial of the DVCPO. Rather, the record reflects White recklessly caused bodily injury to Pinkston and placed her in fear of imminent serious physical harm by slamming her head into the trailer on August 5, 2018. As such, we find that the trial court's finding that White engaged in domestic violence in violation of R.C. 3113.31(A) is supported by competent credible evidence from the record. As a result, the trial court's decision granting the DVCPO against White was not against the manifest weight of the evidence, nor was it contrary to law.

{¶ 36} Accordingly, White's first and second assignments of error are overruled.

{¶ 37} Judgment affirmed.

HENDRICKSON, P.J., and RINGLAND, J., concur.