[Cite as *T.M. v. R.H.*, 2020-Ohio-3013.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| | | | |
|---|---|---|---|
| T.M. | | | C.A. No.    29556 |
| | Appellant | | |
| v. | | | APPEAL FROM JUDGMENT ENTERED IN THE |
| R.H. | | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| | Appellee | | CASE No.    DR-2018-08-2274 |

DECISION AND JOURNAL ENTRY

Dated: May 20, 2020

---

SCHAFER, Judge.

{¶1} Plaintiff-Appellant, T.M., appeals the judgment of the Summit County Court of Common Pleas Domestic Relations Division denying her petition for a domestic violence civil protection order against Defendant-Appellee, R.H. For the reasons that follow, this Court affirms.

I.

{¶2} On August 24, 2018, T.M. filed a petition for a domestic violence civil protection order ("DVCPO") pursuant to R.C. 3113.31. The trial court granted an ex parte CPO, and the matter proceed to a full hearing before a magistrate. Following the full hearing, the magistrate denied T.M.'s petition. The trial court adopted the magistrate's decision that same day. T.M. timely filed preliminary objections to the trial court's adoption of the magistrate's decision and, upon leave of court, filed supplemental objections after the transcript of the hearing was prepared and filed. The trial court subsequently overruled T.M.'s objections and dismissed the petition and the ex parte order.

{¶3}     T.M. filed this timely appeal, raising two assignments of error for our review. We have reordered the assignments of error for ease of analysis.

## II.

### Assignment of Error II

**The trial court erred as a matter of law and abused its discretion in denying [T.M.]'s petition objections to the trial court's adoption of the magistrate's decision.**

{¶4}     In her second assignment of error, T.M. contends that the trial court erred when it reviewed her objections pursuant to Civ.R. 53(D) rather than Civ.R. 65.1. Specifically, T.M. argues that in applying Civ.R. 53(D), the trial court "failed to apply the appropriate standard as set forth in Civ.R. 65.1 when ruling on [T.M.]'s objections to the magistrate's denial of the [DV]CPO[.]" Upon review, we overrule T.M.'s second assignment of error because the trial court applied the proper standard despite citing the incorrect rule in its decision. We note that in addition to argument above, T.M. also asserts in this assignment of error that she established in her objections that the denial of the DVCPO was not supported by credible evidence in the record. However, because this argument is also raised in assignment of error one and considered below, we will not review it here.

{¶5}     The procedural rules governing the issuance of civil protection orders are set forth in Civ.R. 65.1. Pursuant to Civ.R. 65.1(F)(3), a petition for a civil protection order may be referred to a magistrate for determination, but "[a] magistrate's denial or grant of a protection order after full hearing * * * does not constitute a magistrate's order or a magistrate's decision under Civ.R. 53(D)(2) or (3) and is not subject to the requirements of those rules." Civ.R. 65.1(F)(3)(b). A trial court may adopt a magistrate's denial of a protection order "upon review of the order and a determination that there is no error of law or other defect evident on the face of the order." Civ.R.

65.1(F)(3)(c)(ii). Thereafter, a party may file written objections "to a court's adoption, modification, or rejection of a magistrate's denial or granting of a protection order after a full hearing * * * within fourteen days of the court's filing of the order." Civ.R. 65.1(F)(3)(d)(i).

{¶6} The party filling the objections "has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Civ.R. 65.1(F)(3)(d)(iii). Additionally, any objection based on the evidence in the record, must "be supported by a transcript of all the evidence submitted to the magistrate or an affidavit of that evidence if a transcript is not available." Civ.R. 65.1(F)(3)(d)(iv).

{¶7} In this case, the trial court stated that it conducted its review pursuant to Civ.R. 53(D)(4)(d), which provides that, when ruling on objections to a magistrate's decision issued pursuant to Civ.R. 53, a trial court "shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." While the issuance of a DVCPO is governed by Civ.R. 65.1, at least one of our sister districts has recognized that "the rule does not preclude the trial court from engaging in a de novo or independent review of the record prior to ruling on a party's objections," but rather "implies that an independent review of the record by the trial court is required." *Pinkston v. White*, 12th Dist. Butler No. CA2019-06-094, 2019-Ohio-5165, ¶ 15.

{¶8} In *Pinkston*, the Twelfth District concluded that "it would be inconsistent with Civ.R. 65.1 to prohibit the trial court from conducting an independent de novo review of the record prior to ruling on [a party]'s objections" because an objecting party has the burden to prove "'an error of law or other defect [wa]s evidenced on the face of the [magistrate's] order, or that the

credible evidence of record [wa]s insufficient to support the denial of the protection order[,]'" and must support the objections with a transcript of "'all evidence submitted to the magistrate[.]'" *Id.*, quoting Civ.R. 65.1. Citing the language of the Staff Notes accompanying Civ.R. 65.1(G), the Twelfth District further reasoned that the recent amendment of Civ.R. 65.1(G) requiring a party to file objections prior to appealing the trial court's adoption of a magistrate's ruling also supports the implication of an independent review by the trial court. *Id.* at ¶ 16. That Staff Note states one of the amendment's key principles is that it "promotes the fair administration of justice, including affording the trial court an opportunity to review the transcript and address any insufficiency of evidence or abuse of discretion that would render the order or a term of the order unjust." Civ.R. 65.1, 2016 Staff Notes. The Twelfth District concluded that such language gave the appearance that "one purpose of filing objections pursuant to Civ.R. 65.1 is to afford the trial court an opportunity to conduct an independent review of the evidence." *Pinkston* at ¶ 16.

{¶9} Although we find the Twelfth District's reasoning persuasive, we need not adopt the holding in *Pinkston* here because despite the trial court's citation to Civ.R. 53, the court applied the appropriate standard under Civ.R. 65.1. In this case, the magistrate denied T.M.'s petition for a DVCPO because she determined "[b]ased on the totality of the testimony, evidence, and contents of the case file" that T.M. "failed to prove by a preponderance of the evidence that [R.H.] has committed acts of violence as defined by [R.C.] 3113.31, against [T.M.]." The magistrate's decision includes a notification that pursuant to Civ.R. 65.1, any objections to the decision must be filed within fourteen days and that the party filing the objections has the burden to show: (1) an error of law or other defect evident on the face of the order; (2) that the credible evidence of record is insufficient to support the granting or denial of the protection order; or (3) the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order.

*See* Civ.R. 65.1(F)(3)(d)(iii). Although the trial court purported to adopt the magistrate's decision pursuant to Civ.R. 53(D), the trial court included in its journal entry the same Civ.R. 65.1 notifications regarding objections that were included in the magistrate's decision.

{¶10} T.M. timely filed "preliminary objections" asserting, inter alia, that R.H. committed acts of violence against T.M. T.M. also requested leave to file supplemental objections 30 days after the preparation and filing of the hearing transcript. The trial court granted T.M.'s request. After the transcript was filed, T.M. filed her "supplemental objections" asserting T.M. had established by a preponderance of the evidence that she was entitled to a DVCPO protecting her and her minor children from R.H.

{¶11} Upon review, the trial court overruled T.M.'s objections after concluding that T.M. had failed to demonstrate by a preponderance of the evidence that a protection order was necessary to prevent future acts of domestic violence. Prior to making this determination, the trial court stated that its review of the magistrate's decision was governed by Civ.R. 53(D)(4)(d). However, the trial court also cited to this Court's statement in *A.D. v. B.D.*, 9th Dist. Medina No. 15CA0095-M, 2017-Ohio-229, that "[i]n order for a [DV]CPO to issue, 'the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence.'" *A.D.* at ¶ 6 quoting *C.Q. v. P.S.*, 9th Dist. Medina No. 15CA0065-M, 2016-Ohio-4988, ¶ 7. A review of the trial court's journal entry shows that despite its citation of Civ.R. 53, the trial court applied the appropriate standard of review and considered, based on the evidence presented at the hearing, whether T.M. had demonstrated by a preponderance of the evidence that a protection order was necessary to prevent future acts of domestic violence. *See* Civ.R. 65.1(F)(3)(d)(iii) ("A party filing objections under this division has the burden of showing * * * that the credible evidence of record is insufficient to support the

granting or denial of the protection order[.]"). Consequently, any error by the trial court in citing to Civ.R. 53 was harmless and does not constitute reversible error. *See* Civ.R. 61.

{¶12}  T.M.'s second assignment of error is overruled.

## Assignment of Error I

**The trial court erred as a matter of law and abused its discretion in denying [T.M.]'s petition for domestic violence civil protection order.**

{¶13}  In her first assignment of error, T.M. contends that the trial court erred and abused its discretion when it overruled ruled her objections to the trial court's adoption of the magistrate's decision.  We disagree.

{¶14}  In this case, the magistrate denied T.M.'s petition for a DVCPO because she determined "[b]ased on the totality of the testimony, evidence, and contents of the case file[,]" that T.M. had "failed to prove by a preponderance of the evidence that [R.H.] has committed acts of violence as defined by [R.C.] 3113.31, against [T.M.]."  The trial court adopted the magistrate's ruling the same day.  T.M. objected to the trial court's adoption of the magistrate's decision arguing, inter alia, that the evidence presented at the hearing established by a preponderance of the evidence that she was entitled to a DVCPO protecting her and her minor children from R.H.  As noted above and relevant to this assignment of error, as the party filling the objections, T.M. had the burden of showing the credible evidence of record was insufficient to support the denial of the protection order.  Civ.R. 65.1(F)(3)(d)(iii).  Though the trial court concluded that T.M. had failed to demonstrate by a preponderance of the evidence that a protection order was necessary to prevent future acts of domestic violence, the court based this determination on the finding that the evidence presented at the hearing was insufficient to support the granting of a DVCPO on the basis that R.H. had committed an act of domestic violence against T.M.

{¶15} "The decision whether to issue a protection order is within the discretion of the trial court." *W.B. v. T.M.*, 9th Dist. Lorain No. 19CA011474, 2020-Ohio-853, ¶ 8. An abuse of discretion implies that a trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "[A] trial court's decision to grant or deny a protection order is reviewed on appeal under a civil manifest weight standard." *Wetterman v. B.C.*, 9th Dist. Medina No. 12CA0021-M, 2013-Ohio-57, ¶ 8.

> Therefore, we sit as a "thirteenth juror" and review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice[.] In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. [T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.

(Internal quotations and citations omitted.) *T.S. v. R.S.*, 9th Dist. Summit No. 27955, 2017-Ohio-281, ¶ 4.

{¶16} The issuance of a DVCPO is governed by R.C. 3113.31. Pursuant to that statute, a court may grant a protection order after a full hearing "to bring about the cessation of domestic violence against the family or household members or persons with whom the respondent is or was in a dating relationship." R.C. 3113.31(E)(1). In order to grant a DVCPO pursuant to R.C. 3113.31, "the trial court must find that [the] petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. For the purposes of issuing a DVCPO, "[d]omestic violence" is defined, in relevant part, as "[a]ttempting to cause or recklessly causing bodily injury" or "[c]omitting any act with respect to a child that would result in the child being an abused child, as defined in [R.C. 2151.031,]" against a family or household member. R.C. 3113.31(A)(1). Pursuant to R.C. 2151.031(B), the definition of an

"abused child" includes a child who would be considered "endangered" pursuant to R.C. 2919.22 regardless of whether a person has been convicted under that statute. R.C. 2919.22 states, in pertinent part, that a person who is the parent of a minor child is guilty of endangering that child if he "create[s] a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2919.22(A)/(E)(1).

{¶17} T.M. and R.H. both testified at the hearing. T.M. also called New Franklin Police Department Officer Robert Kaaikaula to testify on her behalf. T.M. testified that she and R.H. were divorced in March 2013 and that the parties have a minor child together. She stated that R.H. had court ordered visitation with the child every other weekend and one evening a week. She claimed that R.H. had requested to see the child on a non-scheduled visitation day because T.M. was planning to leave the next day for a vacation with her boyfriend and the child. R.H. wanted to meet T.M.'s boyfriend and also planned to take the child out to dinner. T.M. asserted she did not have a problem with him visiting the child before the vacation because she wanted to "facilitate a healthy relationship."

{¶18} T.M. testified that she agreed to meet R.H. at her new residence on July 31, 2018. T.M. and the child had recently moved into T.M.'s boyfriend's house which was located in a private lake community. When R.H. arrived, she and the child were waiting outside for him. She stated that she told R.H. her boyfriend was not present, but was expected home soon. Upon hearing this, she alleged that R.H. became agitated and that "he had his chest puffed" and "a scowl on his face." Upon observing R.H.'s body language, her "stomach kind of dropped." T.M. stated that R.H. said he would wait, and then grabbed the child's hand and began heading toward a member's only area near the lake. T.M. asserted that when she tried to tell him that he could not enter that area, that he first ignored her, and then started screaming profanities at her in front of their child.

She said that R.H. appeared "angry and hostile" and "infuriated." She stated that she repeatedly told R.H. he had to leave. She further stated that their daughter came over to her and was grabbing her leg and holding on to her. She then asserted that R.H. approached her and struck her on the breast bone with the palm of his hand. She claimed that he hit her hard enough to cause her to "stumble back." When asked why she thought he struck her, she stated "I think it was a reaction to the strong profanity language. I think it was a reaction to [the child] holding onto my leg with her crying."

{¶19} T.M. testified that she began yelling for help. She stated that R.H. then grabbed the child and tried to put her in his truck. She maintained that there was also a German Shepherd in the truck that R.H. had trained to attack her. She stated that during this time the child "was crying and incredibly upset" and that she feared for the child's safety. She stated that she then took the child out of the truck. She stated that when she began to walk away, R.H. grabbed her by the bicep and pulled her back. She asserted that he grabbed her hard enough to leave a handprint on her arm. She stated that R.H. continued to yell profanities at her throughout the incident.

{¶20} T.M. testified that she continued to yell for help and that, in response, her teenaged son and her boyfriend's teenaged son both came out of the house. She stated that her son had a bb gun in his hands. T.M. claimed that R.H. then began yelling profanities at her son while grabbing his own genitalia and gesturing to him. T.M. stated that R.H. eventually got into his truck, but before he left, he backed the truck "way up" to the point she had to move out of the way.

{¶21} T.M. testified that she called the police after R.H. left and that the responding officer arrived within fifteen minutes. She gave the officer a statement, showed him the marks on her arm and chest, and he took pictures of the marks. She stated that she went to the police department after returning from vacation and the police took another picture of the mark on her

chest. She claimed during cross-examination that she told the responding officer there were security cameras on the house that should have recorded the incident, but that she did not know if the officer ever reviewed them. When asked whether she specifically asked the officer that "[R.H. be charged" or that the officer "bring charges also for [her] boyfriend," she claimed that she could not remember whether she specifically asked the officer to charge R.H., or if she asked whether the officer was going to arrest R.H.

{¶22} T.M. acknowledged on cross-examination that pursuant to court order, the parties are required to communicate via Family Wizard, a court-monitored website, and that visitation exchanges of their child are required to occur at the Jackson Township Police Department. When asked if she remembered sending R.H. a text message asking to communicate outside of Family Wizard because her subscription had expired, she maintained that she did not, but that she did remember "sending a text message trying to have a healthy relationship, trying to step outside – you know, have normal communication." She also could not remember if she sent that text message in June or July.

{¶23} T.M. testified that as a result of the above incident, R.H. was charged with domestic violence in the Barberton Municipal Court and that a temporary protection order was issued. She stated that despite this TPO, R.H. instructed his son to call their child to wish her a happy birthday. As a result of this contact, R.H. was also charged with violating the TPO. T.M. stated that no other contact had occurred while any protection order was pending. T.M. acknowledged on cross-examination that she had made previous police reports regarding confrontations between herself and R.H. that had occurred at the Jackson Township Police Station. She also acknowledged that she had previously called the police because she believed R.H. was harassing her over the phone.

T.M. stated that despite her testimony that their child fears R.H., she has not taken the child to see a counselor as a result of the July 31, 2018 incident.

{¶24} Officer Kaaikaula testified that on July 31, 2018, T.M. called the Franklin Township Police Department and he was dispatched as a result. Officer Kaaikaula stated that T.M. made a statement regarding the incident. He said that T.M. told him R.H. had yelled obscenities at her, threatened to harm her, struck her on the chest, and grabbed her arm. He stated that he observed red marks on her chest and arm. He asserted that the red mark on her chest was consistent with being struck and the red marks on her arm were consistent with being grabbed. Officer Kaaikaula acknowledged on cross-examination that T.M.'s first words to him upon his arrival at the scene were, "see the red mark they disappear?" He further stated that when he arrived, "[t]hey were looking at a security footage on their phone [to s]ee if they could find anything of the incident that took place." On cross-examination, Officer Kaaikaula clarified that T.M.'s boyfriend was the individual who presented the security footage to him, suggesting that the incident should have been captured by the camera. Officer Kaaikaula stated that he reviewed the footage, but "[t]here was nothing on the video." He also acknowledged that T.M. suggested to him that R.H. had a history of domestic violence and that he had trained his dog to attack her. Officer Kaaikaula stated that he attempted to follow up with the Jackson Police Department regarding T.M.'s allegation that R.H. had a history of domestic violence, but that he "never heard anything back."

{¶25} Officer Kaaikaula stated that T.M. told him she wanted R.H. to be charged with a crime before he was able to ask if she was willing to go forward with charges. He stated that he had decided to arrest R.H. before he left scene. Officer Kaaikaula described T.M.'s demeanor during their conversation as "shaky a little bit" and again on cross-examination as not "really that shaken up."

{¶26} Officer Kaaikaula stated that later that day he also took a statement from R.H. at the police station. He noted that R.H. had also called the police that day and that R.H. voluntarily came in for an interview. The officer stated that R.H. arrived at the station before he had left T.M.'s house. Officer Kaaikaula stated that R.H. did not "openly admit to anything[,]" but that he still determined to charge him with a crime based on T.M.'s statements.

{¶27} Although Officer Kaaikaula brought his case file to the hearing, he stated that he did not have the official police photographs because they were "sitting with the Prosecutor." Officer Kaaikaula did bring a copy of his body-camera footage. Officer Kaaikaula asserted he had no reason to believe that T.M. was lying and did not believe she was feigning or manipulating the scene. Officer Kaaikaula did acknowledge on cross-examination, however, that T.M. had given him a couple of different versions of the alleged incident.

{¶28} R.H. testified that he and T.M. had been divorced for five years at the time of the incident and that the parties had one daughter together. He also stated that the parties were supposed to communicate through Family Wizard. He further stated that his account was still active, but that T.M. had stopped using the service. R.H. stated that he and T.M. were supposed to pick up and drop off their daughter at the Jackson Police Station pursuant to court order.

{¶29} R.H. testified that the week of the incident, T.M. denied him his regular court-ordered Wednesday visitation because their daughter had been with him the entire week prior for vacation. He asserted that T.M. invited him to her new home because T.M. had denied him his visitation and he wanted to see the child before they left on vacation. R.H. maintained that his understanding of what would occur was that he would pick up the child and take her out to dinner, spend a few hours with her, and meet T.M.'s boyfriend. He stated that he arrived at the agreed

time and that T.M. and their child were on the front porch waiting, but that T.M. said her boyfriend would be back in a few minutes. He said his daughter ran to him and gave him a big hug.

{¶30} R.H. stated that his daughter wanted to show him where she swam, so they started walking toward the lake. He said that when he and his daughter had walked the distance of about two houses, T.M. ran out into the yard and began screaming, "This is private. You can't leave the yard. This is private." He responded by saying that their daughter just wanted to show him where she swims, that they were "not doing anything," and that they would be right back. He testified that in response to his statement, T.M. started screaming, "Well, you're not taking her then." R.H. stated that he understood this to mean that T.M. would deny him his visit with his daughter if he continued. Consequently, he and his daughter turned around and went back to the yard. When asked on cross-examination if this angered him, R.H. responded, "No. Why would I care?" and that he "was just trying to kill some time before [T.M.]'s boyfriend got there."

{¶31} R.H. asserted that when he came back to the yard, T.M. "was being very nasty." He stated that T.M. said he was "a piece of sh*t," and that her new boyfriend was a better dad and that because he had more money than R.H. he would take better care of their daughter. He stated that while T.M. was yelling these things at him, he was holding their daughter. He asserted that he then walked around his truck and strapped his daughter into the backseat. R.H. stated on cross-examination that he decided to leave because T.M. "was acting crazy."

{¶32} R.H. asserted that T.M. came running around the front of the truck yelling that he was not taking their daughter. When he asked why he could not take her, he claimed that T.M. screamed "I'm a c**t, c**t, c**t, c**t." He testified that he told T.M. not to touch his truck, but that she grabbed the door and hit him with it. He stated that she forced the door open with her body and started screaming for help. Throughout his testimony, R.H. maintained that T.M. was

the aggressor in the incident. When asked on cross-examination whether T.M. was "aggressively going after" him, R.H. responded that T.M. was "[v]ery aggressively trying to get into [his] car."

{¶33} As a result of her screams, he said he took his hands off the door and backed off. R.H. testified that T.M. then started to take their daughter out of the truck. He stated that their daughter said "no, mommy. I want to go with daddy[,]" but that T.M. took her out of the truck anyway. R.H. testified that two boys, T.M.'s son and a boy he presumed to be T.M.'s boyfriend's son, came running out of the backyard pointing guns at him. He asserted that T.M.'s son had a 1911 stainless pistol and the other boy had an air rifle. R.H. stated that he told the boys to put the guns down. He stated that he then said, "[T.M.], what are these kids doing? I mean, they were pointing the guns at my daughter and everybody." He conceded that he may have told the boys to "put the f-ing guns down" a few times, but R.H. denied the accusation that he grabbed his genitalia. He asserted that T.M. was "making that up" and that it was "100 percent lie." R.H. maintained on cross-examination that T.M.'s son was carrying a real firearm and not a pellet gun and that he was scared for his life and his daughter's life.

{¶34} R.H. testified that he went back to his truck, got in, got back out, but then got back in and left. He stated that when he was backing out, T.M. was standing in front of his truck by the porch with their daughter. R.H. said that he thought he "spun out a little" in the driveway when put the truck in reverse. R.H. asserted that T.M. then came running around the truck as he was backing out and tried to take a picture of his license plate.

{¶35} R.H. testified that when he was driving down the main lane in the development to leave, T.M.'s boyfriend was driving by. He stated they both stopped their vehicles and an exchange took place. On cross-examination, R.H. stated that he had concerns about T.M.'s boyfriend spanking his daughter because she told him that the boyfriend "hit her a couple times

and cried to [R.H.] about it." Despite theses concerns, he stated it was not his intention to speak the boyfriend about it. He stated that the first thing T.M.'s boyfriend said to him was, "Go back to your piece of sh*t box of a house." In response, R.H. told the boyfriend that he did not come over to start trouble and that his "girlfriend is acting crazy."

{¶36} R.H. testified that he called the police following the above incident because T.M. had "made false accusations in the past." He claimed that she had "accused [him] of some stuff" at the Jackson Police Station, but that it was "all on video, and it didn't happen." He stated he took his dog home and then went directly to the New Franklin Police Station and spoke to a female officer who took a written statement from him. He stated that Officer Kaaikaula came in after he had written his statement and that he handed the statement to him. On cross-examination he said that guns being pointed at and around his daughter scared him and was another reason he called the police.

{¶37} Regarding the red marks on T.M.'s chest and arms, R.H. testified on cross-examination that he did not know where the marks came from, but that he did not cause them. When asked whether he believed T.M. was "manufacturing this story," he stated "yes." R.H. further testified that he did not have any physical contact with T.M. and when asked on cross-examination whether there was a chance that he accidentally struck her in the chest or grabbed her, he stated "no."

{¶38} R.H. testified that he was charged with domestic violence and menacing as a result of the incident and that a temporary protection order was put in place. He asserted that he has not had contact with his daughter since the incident. R.H. acknowledged during cross-examination that he was charged with violating the temporary protection order, but denied directing his son to

contact T.M. to wish their daughter a happy birthday. R.H. maintained that he was found not guilty on all charges. However, during cross-examination, R.H. stated the menacing charge was dropped.

{¶39} On appeal, T.M. first asserts that the trial court's determination that T.M. failed to establish that a protection order was necessary to prevent future acts of domestic violence was "based solely" on the trial court's observation of T.M.'s demeanor on the body-camera footage. This argument is belied by a review of the trial court's journal entry. In the entry, the trial court first outlines the procedural history of the case, the magistrate's decision, and T.M.'s objections before stating the court's own analysis. In considering T.M.'s objections, the trial court cites R.C. 3113.31 and explains what acts constitute domestic violence under that statute. The court then provides a lengthy outline of the testimony presented at the hearing. After outlining the testimony presented at the hearing, the trial court notes that the magistrate was able to use her observation of the witnesses and their demeanors to weigh their credibility. Although the magistrate did not make an explicit determination regarding the credibility of the witnesses in this case, it is evident from the magistrate's denial of T.M.'s petition for a DVCPO, that the magistrate did not find her assertion that R.H. committed an act of domestic violence against her to be credible. The trial court's journal entry notes that the magistrate had the ability to review T.M.'s 9-1-1 call and Officer Kaaikaula's body-camera footage. It is only after this statement that the trial court summarizes its own observations of T.M.'s body-language. Thus, it is apparent from the trial court's journal entry that the court's intent was to give deference to the magistrate's credibility determination in light of the evidence.

{¶40} T.M. also argues that the evidence presented in the record established that R.H. "attempted to cause, and did cause, bodily injury to [T.M.] in the presence of [their] minor child." In making this argument, T.M. cites extensively to her own testimony and a portion of Officer

Kaaikaula's testimony. T.M.'s merit brief, however, completely ignores the contradictory testimony of R.H. and his consistent assertion that he did not strike or grab T.M. T.M.'s brief makes no attempt to explain why the magistrate erred in finding that testimony credible or why the trial court erred in deferring to the magistrate's determination after reviewing the evidence presented.

{¶41} In her reply brief, T.M. attempts to clarify her argument by asserting that the trial court's interpretation of T.M.'s demeanor on the body-camera footage was inconsistent with Officer Kaaikaula's testimony and appears to argue that the trial court should have deferred to Officer Kaaikaula's first-hand observations rather than its own judgment or that of the magistrate. The only testimony Officer Kaaikaula presented regarding T.M.'s demeanor was that she appeared a little shaky. Upon its own examination of the evidence, however, the trial court noted that T.M. did not appear shaken on the body-camera footage and that she sounded calm on the 9-1-1 call. As stated above, under the civil manifest weight of the evidence standard, a reviewing court, we must always be "mindful of the presumption in favor of the trial court's factual findings" and mindful that the "weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *T.S.*, 2017-Ohio-281 at ¶ 4. Moreover, neither the body-camera footage nor the recording of the 9-1-1 call that the trial court relied on were made a part of the appellate record. This Court has consistently held that the appellant has the duty of ensuring that record on appeal is complete. *State v. Daniels*, 9th Dist. Lorain No. 08CA009488, 2009-Ohio-1712, ¶ 22. "In the absence of a complete record, this Court is obligated to presume regularity in the proceedings below." *King v. Carleton*, 9th Dist. Lorain No. 13CA010347, 2013-Ohio-5781, ¶ 30.

{¶42} Moreover, this Court has long recognized that "'the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly.'" *A.M. v. D.L.*, 9th Dist. Medina No. 16CA0059-M, 2017-Ohio-5621, ¶ 20, quoting *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. Because the trier of fact is in the best position to assess matters of credibility, this Court is generally loath to disturb those determinations on appeal. *Wiseman v. Wiseman*, 9th Dist. Medina No. 13CA0009-M, 2014-Ohio-2002, ¶ 28. "[T]he trier of fact is free to believe 'all, part, or none of the testimony of any witness who appeared before it[.]'" *Chuparkoff v. Ohio Title Loans*, 9th Dist. Summit No. 29008, 2019-Ohio-209, ¶ 15, quoting *Bradley v. Cage*, 9th Dist. Summit No. 20713, 2002 WL 274638, *2.

{¶43} Upon review of the record, we cannot say that the trial court clearly lost its way and created a manifest miscarriage of justice in this case. Although conflicting testimony was presented, there was competent, credible evidence in the record to support the trial court's determination that T.M. had not shown by a preponderance of the evidence that she was entitled to a DVCPO. Although T.M. asserted that R.H. had struck her in on the chest and grabbed her arm, R.H. testified that T.M. was the aggressor and that he never made physical contact with her. R.H. further testified that T.M. had made unsubstantiated allegations of violence against him in the past. Because this Court did not have the benefit of observing the parties at the hearing and because there is evidence in record to support the trial court's findings, we conclude that this is not the exceptional case where the evidence weighs heavily in favor of reversal.

{¶44} T.M.'s first assignment of error is overruled.

III.

{¶45} T.M.'s assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

TEODOSIO, J.
CONCURS.

CARR, P. J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

JOSEPH G. STAFFORD and NICOLE A. CRUZ, Attorneys at Law, for Appellant.

CHRISTOPHER DIONISIO, Attorney at Law, for Appellee.